IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,   )
   )
and the STATE OF GEORGIA,   )
   )
   Plaintiffs,   )
   )
   )   Civil Action No. 1:10-cv-04039-SDG
   v.   )
   )   <u>MODIFICATION</u>
   )   <u>TO CONSENT DECREE</u>
DEKALB COUNTY, GEORGIA   )
   )
   Defendant.   )
_____)

WHEREAS, Plaintiffs, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and the State of Georgia, at the request of the Georgia Department of Natural Resources, Environmental Protection Division ("EPD"), filed a complaint in this action on December 13, 2010, alleging that Defendant DeKalb County, Georgia (the "County") violated the Federal Water Pollution Control Act, also known as the Clean Water Act (the "CWA"), 33 U.S.C. § 1251 et seq., the Georgia Water Quality Control Act, O.C.G.A. § 12-5-21 et seq. ("GWQCA"), and the regulations promulgated thereto.

WHEREAS, on December 13, 2010, the United States lodged a Proposed Settlement: Consent Decree Subject to Public Comment resolving the claims alleged in the complaint.

WHEREAS, on May 11, 2011, following a period of public comment, Plaintiffs filed a joint Motion to Enter Consent Decree.

WHEREAS, on May 13, 2011, the County filed a Motion to Enter Consent Decree.

WHEREAS, on December 20, 2011, the Court granted Plaintiffs' joint Motion to Enter Consent Decree and entered the Consent Decree as a judgment of

the Court pursuant to Federal Rules of Civil Procedure 54 and 58, and pursuant to

Section XVII (Effective Date) of the Consent Decree, the Effective Date of the

Consent Decree is therefore December 20, 2011.

WHEREAS, under Paragraph 105 of the Consent Decree, the Consent

Decree may be modified by a subsequent written agreement signed by the United

States, the State, and the County (the "Parties"), and a material change to the

Consent Decree shall be effective only upon approval by the Court.

WHEREAS, the County has acknowledged that a number of contributing

factors limited and delayed its performance in the early years of Consent Decree

implementation such as the County's governing body's delays in hiring a Consent

Decree program manager, significant leadership turnover, and lack of proper

oversight within the County's Department of Watershed Management ("DWM"),

and poor communication between DWM and other County departments and

stakeholders.  As a result, the County learned through the assessment of its WCTS

– undertaken as part of the Capacity, Maintenance, Operations and Management

("CMOM") programs of the Consent Decree – that the extent of capacity

limitations in the WCTS is greater than originally understood.  The assessment also

revealed new challenges in areas not previously anticipated that now require additional attention.

WHEREAS, with an improved understanding of its WCTS and the underlying causes of recurrent capacity-related Sanitary Sewer Overflow ("SSO") sites (both within and outside of the areas previously prioritized for rehabilitation under the Consent Decree) attained through implementation of certain Consent Decree requirements, the County has begun to target the rehabilitation of locations experiencing multiple Sanitary Sewer Overflows, to prioritize reducing the Infiltration and Inflow of non-wastewater ("I/I") into the WCTS to re-capture capacity in the WCTS, and to expand its maintenance, inspections, assessments, and rehabilitation activities.  For example, as reported in the County's publicly available annual reports, in 2017 through 2019, the County replaced nearly 3,000 vented manhole covers with solid covers to reduce I/I, conducted 8,948 manhole condition assessments outside Priority Areas, performed over 5,800 sewer creek crossing inspections, treated over 1.85 million linear feet ("LF") of sewer mains throughout the County to remove root intrusions and prevent blockages, removed over 25 million gallons of Fats, Oils, and Grease ("FOG") from the WCTS, completed installation of the County-wide flow monitoring and rain gauge system

to support development of a dynamic model and system flow analysis, increased FOG enforcement for non-compliant food service establishments, and completed all planned major replacement and rehabilitation projects to the County's lift stations.

WHEREAS, Paragraph 28 of the Consent Decree required the County to develop, by December 20, 2017, a computer-based dynamic hydraulic model for the County's WCTS capable of, inter alia: (1) predicting the volume of wastewater in Force Mains and the Major Gravity Sewer Lines, including predicting the peak flows during wet weather and dry weather conditions; (2) assisting in determining the likelihood and location of capacity-related SSOs from the County's WCTS; and (3) predicting the flow regime of those portions of the WCTS receiving flows from proposed developments.

WHEREAS, the County has represented to EPA/EPD that due to the County's above-described delays and performance problems during the early years of its Consent Decree implementation, the County proposed in February of 2015, in a revised System-Wide Hydraulic Model Program, the use of a static model because it could be developed more quickly and would allow for a faster assessment of its system.

-4-

WHEREAS, on March 27, 2015, EPA/EPD approved the revised System-Wide Hydraulic Model Program, and the County fully developed such a static hydraulic model by December 20, 2017.

WHEREAS, the County has now requested approval to implement a new dynamic hydraulic model that would more accurately characterize flows in its WCTS, more accurately inform the County's remedial actions for its WCTS, enable the County to better manage capacity in its collection system, and make more accurate determinations about where new connections can be accommodated under a new Capacity Assurance Program that is included as part of this Modification to Consent Decree ("Modification").

WHEREAS, the County's new dynamic hydraulic model has been peer-reviewed and is under review by EPA/EPD.

WHEREAS, Paragraph 35 of the Consent Decree establishes a Priority Areas Sewer Assessment and Rehabilitation Program ("PASARP") and requires the County to, among other things, assess and rehabilitate all Initial and Additional Priority Areas by June 20, 2020.

WHEREAS, as a result of the County's slow start in implementing the Consent Decree combined with the expanded scope of the work that remains, the

County failed to timely implement the PASARP and did not meet the June 20, 2020 Consent Decree deadline, which subjects the County to daily stipulated penalties.

WHEREAS, as part of this Modification, the County has requested an extension of the PASARP deadline.

WHEREAS, the County has represented to EPA/EPD that approximately 1,093,000 LF of the County's WCTS within the PASARP require rehabilitation or must otherwise be addressed, that all lift station rehabilitation projects have been completed, and that it does not anticipate building additional lift stations to comply with the requirements of the Consent Decree.

WHEREAS, the County reported the following number of unpermitted discharges of wastewater from its WCTS, or from a Wastewater Treatment Facility ("WWTF") caused by problems in its WCTS, that reached waters of the United States or the State ("Spills") in each year since entry of the Consent Decree: 2012 – 159 Spills; 2013 – 139 Spills; 2014 – 143 Spills; 2015 – 127 Spills; 2016 – 135 Spills; 2017 – 186 Spills; 2018 – 183 Spills; and 2019 – 225 Spills, and has paid $859,000 in stipulated penalties under the Consent Decree for these reported Spills.

WHEREAS, the Parties agree that the Consent Decree should be modified, in light of the substantial work remaining to be completed, to, among other things, extend the original PASARP schedule.

WHEREAS, the Parties agree that it is appropriate the Consent Decree be modified to add a Capacity Assurance Program, which will use information produced by the dynamic hydraulic model to ensure that the WCTS has adequate capacity to manage wastewater flows and that determinations of the WCTS's capacity are made using the best available information.

WHEREAS, the Parties agree that the Consent Decree should be modified to require 103 priority work projects to be completed at certain additional locations in the WCTS that have been identified during the assessment as experiencing repeat SSOs, 48 of which are in Priority Areas identified under the PASARP and 55 which are not in such Priority Areas.

WHEREAS EPA/EPD have determined that it is appropriate to assess, and the County agrees to pay, an additional civil penalty which addresses the County's failure to implement the Consent Decree obligations in accordance with the original Consent Decree schedule and the Spills from its WCTS through 2019.

WHEREAS, the Parties agree that the Consent Decree may be amended pursuant to this Modification.

WHEREAS, the Parties recognize, and the Court by entering this Modification finds, that this Modification has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Modification is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue) of the Consent Decree, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

1.     The terms used in this Modification that are defined in the CWA, or in regulations promulgated pursuant to the CWA, shall have the meanings assigned to them in the CWA or such regulations, unless otherwise provided in the Consent Decree or in this Modification.  Unless otherwise specifically set forth in this Modification and/or in Appendices D, E, and F, which are attached hereto and incorporated herein, the definitions set forth in Section IV (Definitions) of the Consent Decree shall apply to this Modification.

2.     Except as specifically set forth in this Modification, the terms and conditions of the Consent Decree shall remain in full force and effect.

**3.     The following language shall be added to Section V (Civil Penalty) of the Consent Decree as Paragraph 8(a):**

(a)  Within thirty (30) days after the Date of Entry of this Modification, the County shall pay a civil penalty in the amount of $1,047,000 as follows: $523,500 to the United States and $523,500 to the State.  The County shall pay the civil penalty due to the United States in the manner set forth in Paragraph 9 of the Consent Decree and the civil penalty due to the State by submitting a check payable to the State of Georgia and tendered to the Georgia Environmental Protection Division, Director's Office, 2 Martin Luther King, Jr. Drive SE, Suite 1452 East Tower, Atlanta, Georgia 30334.

**4.     Paragraphs 28 and 29 of Section VI (Remedial Actions for County's Wastewater Collection and Transmission System) of the Consent Decree shall be removed and replaced with the following language:**

28.     The County is in the process of developing a computer-based dynamic hydraulic model (the "Dynamic Model") for the County's WCTS utilizing modeling software, including InfoWorks ICM, that will provide a

hydraulic modeling tool with a stable engine capable of processing the information needed to establish existing WCTS hydraulic conditions as well as information needed to plan for future WCTS capacity needs.  The Dynamic Model shall be comprised of a "Sub-Model" for each of the following seven (7) hydraulically separate areas within the WCTS: (1) Snapfinger/Intrenchment Creek; (2) Intergovernmental/Nancy Creek; (3) Intergovernmental/North Fork Peachtree; (4) Intergovernmental/South Fork Peachtree Creek; (5) Snapfinger Basin; (6) Pole Bridge Basin; and (7) Intergovernmental/MISC Sewersheds.  The Dynamic Model shall be consistent with the following criteria:

(a)  The Dynamic Model shall be developed using a combination of GIS databases, record drawings, WCTS maps, flow data, and WCTS inspection records.

(b)  The Dynamic Model shall be capable of predicting the volume of wastewater in Force Mains and the Major Gravity Sewer Lines, including predicting the peak flows during wet weather and dry weather conditions.

(c)  The Dynamic Model shall be capable of assisting in determining the likelihood and location of capacity-related SSOs from the County's WCTS.

(d)  The Dynamic Model shall be capable of predicting the hydraulic pressure (psig) and flow capacity of wastewater at any point in Force Mains throughout the County's WCTS.

(e)  The Dynamic Model shall be capable of predicting the flow capacity of each lift station (for Major Lift Stations, the County may elect to perform manual calculations in lieu of using the Model to evaluate lift station capacity), including predicting the peak flows during wet weather and dry weather conditions.

(f)  The Dynamic Model shall be capable of predicting the flow regime of those portions of the WCTS receiving flows from new sewer service connections or increases in flow from existing sewer service connections.  The Dynamic Model will assist the County in assuring the availability of WCTS and WWTF capacity prior to permitting flows from new sewer service connections or increases in flow from existing sewer service connections.

(g)  The Dynamic Model shall include procedures and protocols for the performance of sensitivity analyses (i.e., how the Dynamic Model responds to changes in input parameters and variables); for calibrating the Dynamic Model to account for values representative of the County's WCTS using actual system data

-11-

(e.g., flow data); and to verify the Dynamic Model's performance using actual system data (e.g., flow data).

29.    (a)  The County has completed each Sub-Model and has submitted to EPA/EPD for review and comment, pursuant to the requirements of Section VII (Review of Submissions/Certification of Submissions) of the Consent Decree, a Sub-Model Report for each of the Sub-Models.  Each Sub-Model Report shall be written and organized to facilitate clear understanding of the assumptions used in the Sub-Model and how the Sub-Model is used to inform the County's decisions, and shall provide an explanation of the following elements of the Sub-Model:

(1)  A description of the Sub-Model;

(2)  The specific attributes, characteristics, and limitations of the Sub-Model;

(3)  An identification of all input parameters, constants, and assumed values of the Sub-Model;

(4)  Any global assumptions and the design storm used in the Sub-Model;

(5)  The expected outputs of the Sub-Model;

(6)  The procedures and protocols used to evaluate the Sub-Model's performance;

(7)  Model sensitivity analyses;

(8)  Calibration procedures and the basis for inputs used to characterize I/I into the Sub-Model;

(9)  A description of how the Sub-Models will be hydraulically integrated or fit into the County's three (3) sewer basins;

(10)  After submission of the first Sub-Model, any deviation in the Sub-Model's methodology from the methodology used in the first Sub-Model shall be highlighted and explained; and

(11)  Any unexpected or other output from the Sub-Model that will affect the County's ability to comply with any of the deadlines or other requirements of the Consent Decree or this Modification.

The County shall also provide in the Sub-Model Reports a certification that the Sub-Model was developed fully consistent with the requirements of the Consent Decree, as amended by this Modification.  EPA/EPD may subsequently conduct periodic audits of the Dynamic Model implementation

without prior notice to the County.  EPA/EPD shall provide a written report to the County of the findings/results of any such audit.

(b) The County has developed a Capacity Assurance Program ("CAP"), attached hereto and incorporated herein as Appendix D, which has been reviewed and approved by EPA/EPD.  The CAP will allow the County to identify each Sewershed or part of a Sewershed with insufficient capacity under either peak wet weather, or average conditions, or both, and to analyze all portions of the WCTS that hydraulically impact all known SSOs.  The CAP will assess peak flow capacity of all major system components for existing and proposed flows.

(c)  Upon written approval by EPA/EPD of each Sub-Model Report, the County shall authorize pursuant to the CAP new sewer service connections or increases in flow from existing sewer service connections in the portion of the WCTS covered by that Sub-Model only after: (1) certifying that the receiving portions of the WCTS have "Adequate Collection Capacity" and "Adequate Transmission Capacity" and the applicable WWTF has "Adequate Treatment Capacity" (as these terms are defined in subparagraph (d) below) to accept flows from such new sewer service connections or increases in flows from existing service connections; (2) certifying that the receiving portions of the WCTS have

"Adequate Transmission Capacity", the applicable WWTF has "Adequate

Treatment Capacity" (as these terms are defined in subparagraph (d) below) to

accept flows from such new sewer service connections or increases in flows from

existing service connections, and that all "New Connection Conditions" identified

in new Paragraph 29(f) are satisfied; or (3) certifying its proper use of the In-Lieu

of Certification, Essential Services, Illicit Connections and/or Lateral Connections

provisions in the CAP.  All certifications of Adequate Collection Capacity,

Adequate Transmission Capacity, and Adequate Treatment Capacity shall be

made and stamped by a professional engineer registered in the State of Georgia

and shall be approved by a responsible party of the County as defined by 40

C.F.R. § 122.22(b).  The County shall maintain all such certifications and all data

on which such certifications are based as required by Paragraph 88 of the Consent

Decree.

        (d)(1)  The County's certification of "Adequate Treatment Capacity"

shall confirm that, at the time the WWTF receives the flow from a proposed new

sewer service connection(s) or increased flow from an existing sewer service

connection(s), when combined with the flow predicted to occur from all other

authorized sewer service connections (including those that have not begun to

discharge into the WCTS), the WWTF will not be in "non-compliance" for quarterly reporting as defined in Appendix A to 40 C.F.R. Part 123.45.

(2)  The County's certification of "Adequate Transmission Capacity" shall confirm that each lift station (except for those lift stations with only one pump) through which the proposed additional flow from new or existing sewer service connections would pass to the WWTF receiving such flow has the capacity to transmit, with its largest pump out of service, the existing One (1) Hour Peak Flow passing through the lift station, plus the addition to the existing One (1) Hour Peak Flow predicted to occur from the proposed connection, plus the addition to the existing One (1) Hour Peak Flow predicted to occur from all other authorized sewer service connections that have not begun to discharge into the WCTS.

(3)  The County's certification of "Adequate Collection Capacity" shall confirm that each gravity sewer line, through which the proposed additional flow from new or existing connections would pass, has the capacity to carry the existing One (1) Hour Peak Flow passing through the gravity sewer line, plus the addition to the existing One (1) Hour Peak Flow from the proposed connection, plus the addition to the existing One (1) Hour Peak Flow predicted to

-16-

occur from all other authorized sewer service connections that have not begun to discharge into the WCTS without causing a Surcharge Condition.

(4)  For purposes of this Paragraph only, the term "One (1) Hour Peak Flow" shall mean the greatest flow in a sewer averaged over a sixty (60) minute period at a specific location expected to occur as a result of a representative two (2) year twenty-four (24) hour storm event.

(5)  For purposes of this Paragraph only, the term "Surcharge Condition" shall mean the condition that exists when the supply of wastewater resulting from the One (1) Hour Peak Flow is greater than the capacity of the pipes to carry it or the surface of the wastewater rises to an elevation greater than the top of the pipe, and the sewer is under pressure or head, rather than at atmospheric pressure.  However, if the County has identified sewer line segments which have been specifically designed and constructed to operate under surcharge conditions (e.g., segments with welded or bolted joints), and has identified the level of surcharge for those segments, the identified level of surcharge will be used. Notwithstanding the immediately preceding sentence, any rise in elevation above the top of the pipe shall be considered a Surcharge Condition if the manhole has experienced a wet weather SSO since December 20, 2017 (excluding those SSOs

-17-

caused by severe natural conditions such as hurricanes, tornados, widespread flooding, earthquakes, and other similar natural conditions ("Severe Natural Conditions")), unless the County can certify that the cause of the SSO has been corrected through improvements to the WCTS.

(e)  Until the County has received written approval from EPA/EPD of a Sub-Model Report for each one of the seven (7) hydraulically separate areas within the WCTS, the County shall continue to use in that area its existing static hydraulic models and shall continue to certify adequate collection capacity, adequate transmission capacity, and adequate treatment capacity for all new sewer service connections or increases in flow from existing sewer service connections pursuant to the original provisions of Paragraph 28(g) of the Consent Decree.

(f)  The "New Connection Conditions" referred to in new Paragraph 29(c) are:

(1)  The Dynamic Model does not predict any overflows from the new sewer service connections and/or increases in flow from the existing sewer service connections;

(2)  The Dynamic Model does not predict that, after adding the new sewer service connections and/or increases in flow from the existing sewer

service connections to all existing and authorized sewer connections, the

wastewater in any manhole from the One (1) Hour Peak Flow resulting from a

representative two (2) year twenty-four (24) hour storm event will rise to an

elevation within two (2) feet of ground surface at any location in the WCTS

through which the proposed additional flows from the new or existing connection

would pass.  However, for manholes within 350 feet of the entrance to or exit from

aerial crossings (at locations including creeks, dry beds, stormwater ditches and

conveyances, and intermittent and ephemeral streams) with less than two (2) feet

of ground cover over their connecting pipes, the wastewater predicted as described

above shall not rise to an elevation within two (2) feet of manhole rim.

       (3)  All capacity-related locations on the "Priority Fix List" (as

described in new Paragraph 35(j)) downstream of the proposed new sewer service

connection or proposed increase in flow from an existing sewer service connection

have been adequately rehabilitated, relieved, fixed, or otherwise addressed

("Adequately Fixed" (This term is defined only for purposes of determining

eligibility for removal of such location from the Priority Fix List and for

satisfaction of the New Connection Conditions.  The County shall not maintain

Adequately Fixing any location on the Priority Fix List as a defense to any

subsequent violation of the CWA, the GWQCA, and the regulations promulgated thereto at such location nor to the imposition of stipulated penalties pursuant to Section X (Stipulated Penalties) of the Consent Decree.)), and either:  (i) at least one (1) year has passed since completion of such Adequate Fixes without a capacity-related SSO occurring at any such location; or (ii) each such location has experienced a two (2) year twenty-four (24) hour storm event (or a twenty-four (24) hour storm event of greater size) without a capacity-related SSO; and

(4)  Any location that has experienced a capacity-related SSO (excluding those SSOs caused by Severe Natural Conditions) within the previous two (2) years downstream of the proposed new sewer service connection or proposed increase in flow from an existing sewer service connection has been adequately rehabilitated, relieved, fixed, or otherwise addressed, and either:  (i) at least one (1) year has passed without a capacity-related SSO (excluding those SSOs caused by Severe Natural Conditions) occurring at each such location; or (ii) each such location has experienced a two (2) year twenty-four (24) hour storm event (or a twenty-four (24) hour storm event of greater size) without a capacity-related SSO (excluding those SSOs caused by Severe Natural Conditions).

**7.     Paragraph 35(i) of the Consent Decree shall be removed and replaced with the following language:**

(i)  Provide for the identification, delineation, assessment and rehabilitation of all Initial and Additional Priority Areas no later than December 20, 2027.  Attached as Appendix E is a schedule for the identification, delineation, assessment and rehabilitation of the Initial and Additional Priority Areas, including interim milestone dates based on amounts of "Minimum Linear Footage of Pipe Review, Design, and Rehabilitation" (as that term is defined in Appendix E) of four (4) "Project Categories" to be completed in the Initial and Additional Priority Areas each calendar year, beginning calendar year 2020 and continuing each calendar year until completion of the PASARP.  The Project Categories, which are also each defined in Appendix E, are: (1) Simple Pipe Review, (2) Simple Pipe Rehabilitation, (3) Complex Pipe Design, (4) and Complex Pipe Rehabilitation.  In addition to identifying the total Minimum Linear Footage of Pipe Review, Design, and Rehabilitation for each Project Category to be completed each calendar year, the schedule identifies the specific projects to be completed before December 31, 2021.  The County's rehabilitation of all the Minimum Linear Footage of Pipe Review, Design, and Rehabilitation shall not, by itself, constitute complete

-21-

implementation of the PASARP; all other components of the PASARP shall continue to apply as required by Paragraph 35 of the Consent Decree.

Beginning February 1, 2022, and continuing each February 1 until completion of the PASARP, the County shall provide a certified report to EPA/EPD, pursuant to the requirements of Section VII (Review of Submissions/Certification of Submissions) of the Consent Decree, identifying all projects planned to satisfy the Minimum Linear Footage of Pipe Review, Design, and Rehabilitation requirement for each Project Category for that calendar year, as well as a list of any lift station rehabilitation and/or construction and construction of additional storage planned for any subsequent years until completion of the PASARP and a deadline for completion of such project(s).  The County shall not be precluded from re-prioritizing linear footage rehabilitation projects in any given calendar year or between calendar years, provided that the County achieves the total Minimum Linear Footage of Pipe Review, Design, and Rehabilitation for each Project Category for the given calendar year.  The County must submit to EPA/EPD for review and comment, pursuant to the requirements of Section VII (Review of Submissions/Certification of Submissions) of the Consent Decree, any plans to re-prioritize, lift station rehabilitation and/or construction or construction

of additional storage.  Additional linear footage of rehabilitation work of a

particular Project Category completed in a given calendar year beyond the

minimum requirement for that particular calendar year shall be counted toward the

subsequent year or years.

**8.     The following language shall be added to Section VI (Remedial**

**Actions for County's Wastewater Collection and Transmission System) of the**

**Consent Decree as Paragraph 35(j):**

(j)   <u>Priority Fix List and Repeat SSO Locations.</u>  Attached hereto and

incorporated herein as Appendix F is an initial "Priority Fix List" of 103 locations

in the County's WCTS that that are known to have experienced repeated SSOs

since the Effective Date of the Consent Decree through June 30, 2020.  Within two

(2) years of the Date of Entry of this Modification, the County shall adequately

rehabilitate, relieve, fix, or otherwise address fifty percent (50%) of the locations in

Appendix F so that no future SSOs are predicted to occur at such locations as a

result of a representative two (2) year twenty-four (24) hour storm event, and

within four (4) years of the Date of Entry of this Modification, the County shall

adequately rehabilitate, relieve, fix, or otherwise address all locations in Appendix

F so that no future SSOs are predicted to occur at any such locations as a result of a

representative two (2) year twenty-four (24) hour storm event.  No later than February 1, 2021, the County may submit to EPA/EPD for review and approval, a request for additional time to Adequately Fix up to twenty-one (21) specific locations in Appendix F; the County may invoke Dispute Resolution pursuant to Section XII (Dispute Resolution) of the Consent Decree if EPA/EPD do not approve.  Any such request shall include a detailed description of the proposed project to Adequately Fix the location, a proposed timeline (including interim project milestones), and a technical justification for the proposed timeline, which must not extend beyond December 20, 2027.

Any location in the County's WCTS shall immediately be added to the Priority Fix List if it experiences in any twelve (12) month period either two (2) or more SSOs caused by a lack of Adequate Collection Capacity or Adequate Transmission Capacity (including I/I and/or storms, but excluding those SSOs caused by Severe Natural Conditions)) or two (2) or more SSOs caused by non-capacity reasons within a 500-foot radius area ("Repeat SSO Location").  If the County believes that a specific SSO should not be counted in determining whether a location shall be deemed a Repeat SSO Location, it shall notify EPA/EPD within sixty (60) days of the SSO and provide a detailed, certified

explanation of the reason(s) for its belief; the County may invoke Dispute Resolution pursuant to Section XII (Dispute Resolution) of the Consent Decree if EPA/EPD do not agree.  Additionally, no Repeat SSO Location shall be added to the Priority Fix List after EPA/EPD approve the County's PASARP Report (as required by Paragraph 37 of the Consent Decree).

If any Repeat SSO Location is added to the Priority Fix List prior to, on, or within two (2) years of, the Date of Entry of this Modification, the County shall, within four (4) years of the Date of Entry of this Modification, adequately rehabilitate, relieve, fix, or otherwise address such location so that no future SSOs are predicted to occur at such location as a result of a representative two (2) year twenty-four (24) hour storm event.  If any Repeat SSO Location is added to the Priority Fix List after two (2) years of the Date of Entry of this Modification, the County shall, within two (2) years of the location's addition to the Priority Fix List (i.e., the date of the second qualifying SSO), adequately rehabilitate, relieve, fix, or otherwise address the location so that no future SSOs are predicted to occur at such location as a result of a representative two (2) year twenty-four (24) hour storm event.

If any Repeat SSO Location associated with Major Gravity Sewer Lines is added to the Priority Fix List after Date of Entry of this Modification and the County determines that it cannot Adequately Fix the location within the timelines proscribed in the immediately preceding paragraph, the County may, within ninety (90) days of such location being added to the Priority Fix List, submit to EPA/EPD for review and approval, a proposed alternative timeline for addressing the location; the County may invoke Dispute Resolution pursuant to Section XII (Dispute Resolution) of the Consent Decree if EPA/EPD do not approve.  Any such request shall include a detailed description of the proposed project to Adequately Fix the location, a proposed timeline (including interim project milestones), and a technical justification for the proposed timeline.

**9.    The following language shall be added to Section IX (Reporting Requirements) of the Consent Decree as Paragraph 56(a):**

(a)  In addition to the information in Paragraph 56 of the Consent Decree, each Quarterly SSO Report shall also include:

(1)  For each SSO, a determination of whether such SSO was caused by either a lack of Adequate Collection Capacity or Adequate Transmission

Capacity, or by non-capacity reasons, and documentary support for the County's determination, including, where appropriate:

(i)  If the County determines the cause of a particular SSO to be due to FOG, debris, any other sewer blockage, or infrastructure failure, the County shall provide photographic or video evidence supporting such determination or shall provide documentation of dry weather conditions at the time of the SSO based on information from the closest rainfall monitoring station to the SSO's location.

(ii)  If the County determines the cause of a particular SSO to be a lack of Adequate Collection Capacity or Adequate Transmission Capacity and the SSO occurred during a precipitation event, the County shall provide rainfall data from the closest rainfall monitoring station to the SSO's location; except, the County may presume an SSO is capacity-related if it documents in its Quarterly SSO Report, after investigating the cause of the SSO, that it was unable to locate any evidence of FOG, debris, any other sewer blockage, or infrastructure failure.

(b)  For each SSO, the Initial or Additional Priority Area in which such SSO occurred, if applicable.

-27-

(c)  An updated Priority Fix List of all Repeat SSO Locations, as provided in new Paragraph 35(j).

(d)  If the rehabilitation of any Repeat SSO Location was scheduled to be completed during the previous applicable three (3) month period, a statement that such work has or has not been completed.  The County shall include a detailed written description of any such work not completed, the reasons for failing to complete such work, and the expected date of completion.  If any missed deadline cannot be fully explained at the time the report is due, the County shall include a statement to that effect in the report.  The County shall investigate to determine the cause of the missed deadline and then shall submit an amendment to the report, including a full explanation of the cause of the missed deadline, within thirty (30) days after submission of the Quarterly SSO Report.

**10.    The following language shall be added to Section IX (Reporting Requirements) of the Consent Decree as Paragraphs 57(c)-(e):**

(c)  Each Semi-Annual Report shall include a detailed written description, supplemented by a Gantt chart, of projects and significant activities completed and interim milestone dates and deadlines achieved under the PASARP during the previous applicable six (6) month period for each Initial or Additional

Priority Area. Each Semi-Annual Report shall also include a list of all Initial

and/or Additional Priority Areas wherein the County has completed all work

required by the PASARP and the date on which the County completed such work.

Each Semi-Annual Report shall also include a detailed written description of any

missed interim milestone date and deadlines, the reasons for missing such interim

milestone dates and deadlines, and the expected date for completing the applicable

work.  If any missed interim milestone date or deadline cannot be fully explained

at the time the report is due, the County shall include a statement to that effect in

the report.  The County shall investigate to determine the cause of the missed

interim milestone date or deadline and then shall submit an amendment to the

report, including a full explanation of the cause of the missed deadline, within

thirty (30) days after submission of the Semi-Annual Report.  If the Parties agree to

discontinue the Semi-Annual Reports pursuant to Paragraph 57 of the Consent

Decree, then the information required in this subparagraph shall be included in

each Annual Report submitted pursuant to Paragraph 58 of the Consent Decree and

shall cover the applicable twelve (12) month periods rather than six (6) months.

(d)  Each Semi-Annual Report shall include a detailed written

description, supplemented by a Gantt chart, of projects and significant activities

anticipated to be performed and interim milestone dates and deadlines anticipated to be achieved under the PASARP during the successive applicable six (6) month period in each Initial or Additional Priority Area, and a list of all Initial and/or Additional Priority Areas wherein the County anticipates completing all work required by the PASARP and the date on which the County anticipates completing such work.  If the Parties agree to discontinue the Semi-Annual Reports pursuant to Paragraph 57 of the Consent Decree, then the information required in this subparagraph shall be included in each Annual Report submitted pursuant to Paragraph 58 and shall cover the applicable twelve (12) month periods rather than six (6) months.

(e)  In addition to all reporting requirements previously described in this Section, after entry of this Modification, the County shall file a copy of each new Quarterly and Semi-Annual Report with this Court on the same date such report is required to be filed with EPA/EPD under Paragraph 57 of the Consent Decree.  If the Parties agree to discontinue the Semi-Annual Reports pursuant to Paragraph 57 of the Consent Decree, then the County shall file a copy of each Annual Report with this Court on the same day such report is required to be filed with EPA/EPD.

-30-

**11.     The following language shall be added to Section IX (Reporting Requirements) of the Consent Decree as Paragraph 58(c)-(f):**

(c)  The Minimum Linear Footage of Pipe Review, Design, and Rehabilitation completed in each Project Category for that calendar year, a detailed written description of the work that was done to complete such rehabilitation, and a detailed written description of how the County calculated the Minimum Linear Footage of Pipe Review, Design, and Rehabilitation completed and how it apportioned such rehabilitation to each Project Category.

(d)  A description of any lift station rehabilitation and/or construction and construction of additional storage undertaken and/or completed pursuant to modified Paragraph 35(i).

(e)  A detailed written description of all ongoing or completed work at the locations on the Priority Fix List and a list of such locations that have been adequately rehabilitated, relieved, fixed, or otherwise addressed so that no future SSOs are predicted to occur at any such locations as a result of a representative two (2) year twenty-four (24) hour storm event.

(f)  If the County fails to timely adequately rehabilitate, relieve, fix, or otherwise address the locations on the Priority Fix List pursuant to the deadlines in new Paragraph 35(j), a detailed written explanation of the reasons for such failure.

**12.     The following language shall be added to Section X (Stipulated Penalties) of the Consent Decree as Paragraph 64(a):**

(a)  If the County fails to pay the civil penalty required to be paid to the United States or the State under new Paragraph 8(a) when due, the County shall pay a stipulated penalty of $1,000 per day for each day that the payment is late.

**13.     Paragraphs 65(b)-(d) of the Consent Decree shall be removed and replaced with the following language:**

(b)  For each day the County fails to complete the implementation of the PASARP in accordance with the deadline in modified Paragraph 35(i), a stipulated penalty may be assessed as follows:

| Period Beyond Completion Date | Penalty Per Day |
| --- | --- |
| 1-30 days | $2,000 |
| 31-60 days | $3,000 |
| 61-120 days | $4,000 |
| More than 120 days | $6,000 |

(c)  For each Spill of 10,000 gallons or less, a stipulated penalty of $2,000 may be assessed.

(d)  For each Spill of more than 10,000 gallons, a stipulated penalty of $5,000 may be assessed.

**14.    The following language shall be added to Section X (Stipulated Penalties) of the Consent Decree as Paragraphs 65(e)-(j):**

(e)  For each day the County fails to timely achieve the Minimum Linear Footage of Pipe Review, Design, and Rehabilitation for a particular calendar year required by modified Paragraph 35(i) and stated in Appendix E, a stipulated penalty may be assessed as follows:

| Period Beyond Completion Date | Penalty Per Day |
|---|---|
| 1-30 days | $1,000 |
| 31-60 days | $1,500 |
| 61-120 days | $2,000 |
| More than 120 days | $3,000 |

(f)  For each day the County fails to timely complete the lift station rehabilitation and/or construction and construction of additional storage by the

deadline provided by the County pursuant to modified Paragraph 35(i), a stipulated penalty may be assessed as follows:

| Period Beyond Completion Date | Penalty Per Day |
| --- | --- |
| 1-30 days | $1,000 |
| 31-60 days | $1,500 |
| 61-120 days | $2,000 |
| More than 120 days | $3,000 |

(g)     (1)  For each new sewer service connection or increase in flow from an existing sewer service connection of 2,500 gallons per day or less authorized by the County in violation of new Paragraphs 29(c), (d) and/or (e), a stipulated penalty of $10,000 may be assessed.

(2)  For each new sewer service connection or increase in flow from an existing sewer service connection of more than 2,500 gallons per day authorized by the County in violation of new Paragraphs 29(c), (d) and/or (e), a stipulated penalty of $50,000 may be assessed.

(h)  For each Priority Fix List location for which the County fails to timely complete the rehabilitation work required by new Paragraph 35(j), a stipulated penalty may be assessed for each day as follows (i.e., if the County fails

to complete the rehabilitation work at multiple Priority Fix List Locations, daily

stipulated penalties for each location may be assessed):

| Period Beyond Completion Date | Penalty Per Day |
|---|---|
| 1-30 days | $1,000 |
| 31-60 days | $1,500 |
| 61-120 days | $2,000 |
| More than 120 days | $3,000 |

(i)  For each SSO for which the County inaccurately designates as capacity-related or not capacity-related in a Quarterly SSO Report, based on data available at the time of the report, a stipulated penalty of $5,000 may be assessed.

(j)  For each SSO that the County provides inadequate documentary support in a Quarterly SSO Report, a stipulated penalty of $5,000 may be assessed.

Dated and entered this __ day of _____, ____.


_____
Steven D. Grimberg
UNITED STATES DISTRICT JUDGE
Northern District of Georgia

WE HEREBY CONSENT to the entry of this Modification of the Consent Decree

in *United States et al. v. DeKalb County, Georgia*, subject to the public notice and

comment provisions of 28 C.F.R. 50.7:


                                 JONATHAN D. BRIGHTBILL
                                 Principal Deputy Assistant Attorney General
                                 Environment and Natural Resources Division
                                 U.S. Department of Justice


                                 /s/ Valerie K. Mann
                                 VALERIE K. MANN
                                 Trial Attorney
                                 Environmental Enforcement Section
                                 Environment and Natural Resources Division
                                 United States Department of Justice
                                 P.O. Box 7611
                                 Washington, DC 20044-7611
                                 150 M St, NE
                                 Washington, D.C. 20530
                                 DC Bar 440744
                                 Telephone:  (202) 616-8756
                                 Facsimile:  (202) 514-0097
                                 E-mail:  Valerie.mann@usdoj.gov

WE HEREBY CONSENT to the entry of this Modification of the Consent Decree in *United States et al. v. DeKalb County, Georgia*, subject to the public notice and comment provisions of 28 C.F.R. 50.7:

BYUNG J. PAK
*United States Attorney*
Northern District of Georgia

/s/ Trishanda L. Treadwell
TRISHANDA L. TREADWELL
*Assistant United States Attorney*
Georgia Bar No. 356896
Richard Russell Federal Building
75 Ted Turner Drive SW
Atlanta, Georgia
Telephone:  (404) 581-6000
Facsimile:  (404) 581-6181
Email:  Trish.treadwell@usdoj.gov

WE HEREBY CONSENT to the entry of this Modification of the Consent

Decree in *United States et al. v. DeKalb County, Georgia*, subject to the public

notice and comment provisions of 28 C.F.R. 50.7:


SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

ROSEMARIE KELLEY
Office Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

MARK POLLINS
Division Director
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

ROBERT D. FENTRESS
Attorney-Advisor
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

WE HEREBY CONSENT to the entry of this Modification of the Consent

Decree in *United States et al. v. DeKalb County, Georgia*, subject to the public

notice and comment provisions of 28 C.F.R. 50.7:

LEIF PALMER
Regional Counsel
United States Environmental Protection Agency
Region 4
61 Forsyth Street
Atlanta, Georgia 30303
Telephone:  (404) 562-9542
Facsimile:  (404) 562-9663
Email:  Palmer.leif@epa.gov

PAUL SCHWARTZ
Associate Regional Counsel
United States Environmental Protection Agency
Region 4

NATHAN H. STOPPER
Assistant Regional Counsel
United States Environmental Protection Agency
Region 6

WE HEREBY CONSENT to the entry of this Modification of the Consent

Decree in *United States et al. v. DeKalb County, Georgia*:


CHRISTOPHER M. CARR
*Attorney General*


/s/ Margaret Kemmerly Eckrote
MARGARET KEMMERLY ECKROTE
*Georgia Bar No. 238709*
*Deputy Attorney General*

ROBIN LEIGH
*Senior Assistant Attorney General*


/s/ Christopher R. Held
CHRISTOPHER R. HELD
Georgia Bar No. 987847
*Assistant Attorney General*
40 Capitol Square SW
Atlanta, GA 30334-1300
Telephone: (404) 458-3569
Email: peckrote@law.ga.gov
Email: cheld@law.ga.gov

WE HEREBY CONSENT to the entry of this Modification of the Consent

Decree in *United States et al. v. DeKalb County, Georgia*:


THE HONORABLE MICHAEL L. THURMOND
Chief Executive Officer
DeKalb County Government


MARIA V. HOUSER
Director
DeKalb Consent Decree and Environmental Compliance


VIVIANE H. ERNSTES
County Attorney
DeKalb County Law Department


E. FITZGERALD VEIRA
Georgia Bar Number 726726
Troutman Pepper Hamilton Sanders LLP
Special Counsel to DeKalb County
600 Peachtree Street NE, Suite 3000
Atlanta, Georgia 30308-2218
Telephone:  (404) 885-3278
Facsimile:  (404) 962-6711
Email:  Fitzgerald.Veira@Troutman.com