IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,
and the STATE OF GEORGIA,

     Plaintiffs,

v.

DEKALB COUNTY, GEORGIA,

     Defendant.

CIVIL ACTION NO.

1:10-cv-04039-SDG

## DEKALB COUNTY'S RULE 60(b) MOTION
## FOR A SECOND MODIFICATION TO THE CONSENT DECREE AND
## INCORPORATED BRIEF IN SUPPORT

Defendant DeKalb County, Georgia ("the County"), hereby files this Motion for a Second Modification to the Consent Decree (ECF No. 39) pursuant to Federal Rule of Civil Procedure Rule 60(b). The deadlines in the Modified Consent Decree (ECF No. 83, "MCD") were developed on the basis that sanitary sewer overflows ("SSOs") associated with capacity-limited trunk sewers could be fixed using parallel relief sewers and in-basin storage tanks. Subsequent engineering design assessments of the system identified conditions making that strategy substantially more onerous. This significant change in circumstances warrants modifying the deadlines in the MCD because applying the MCD prospectively is no longer equitable, modification is in the public interest, and the proposed extended deadlines are suitably tailored to

1

the changed circumstances. Accordingly, the County respectfully requests that the Court order applicable provisions of the Consent Decree be modified consistent with the following requested relief:

- Extend Priority Fix List ("PFL") site deadlines in accordance with the schedule in Exhibit 1. Furthermore, extend deadlines for any additional capacity-limited sites later added to the PFL that are associated with trunk sewer projects identified in Exhibit 1 to the associated project deadline.

- Extend the deadline for rehabilitation of all Initial and Additional Priority Areas ("Priority Areas") as required by the Priority Areas Sewer Assessment and Rehabilitation Program ("PASARP") to June 30, 2037.

- Terminate the remaining complex rehab minimum linear footage ("MLF") milestones.

## PROCEDURAL HISTORY

This matter arises out of a threatened enforcement action commenced by the United States Environmental Protection Agency ("EPA") and Georgia Environmental Protection Division ("EPD") (together, "the Agencies" or "Plaintiffs") alleging the County violated the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, and the Georgia Water Quality Control Act, O.C.G.A. § 12-5-21 *et seq*. In response to Plaintiffs' allegations, Plaintiffs and the County negotiated a complex and detailed

settlement resulting in a Consent Decree. This Court approved and entered the Consent Decree on December 20, 2011. ECF No. 39.

Initially, efforts to implement the Consent Decree were delayed by several factors, such as difficulties in hiring a Consent Decree Program Manager, significant leadership turnover and lack of proper oversight within the DeKalb Department of Watershed Management ("DWM"), and insufficient communication between DWM and other County departments and stakeholders. ECF No. 76-1 at 3. As the County assessed Priority Areas and implemented its Capacity, Maintenance, Operations, and Management ("CMOM") Programs, it discovered that "SSOs" were more often the result of capacity limitations than previously realized, rather than maintenance issues like blockages from grease. Consequently, addressing system capacity limitations became a more central focus of the County's efforts to reduce and eliminate SSOs. *Id*.; ECF No. 76-2 at 11–12. The Parties then began negotiating a modification to the Consent Decree in April 2019. *See* ECF Nos. 61, 72, and 76. Following a hearing on the motions, this Court entered the operable MCD on September 22, 2021. ECF No. 83.

The MCD modified or added three key provisions to the Consent Decree: First, the MCD established a novel PFL program, assigning certain deadlines to "Adequately Fix" a predetermined list of 103 PFL sites as well as any new locations that experience two SSOs within a twelve-month period. ECF No. 83 at 25. The

MCD provided that the County could request additional time to Adequately Fix up to twenty-one specific locations (with the opportunity to request additional time for future-added PFL sites). ECF No. 83 at 25, 27–28. Second, the MCD created MLF interim milestone requirements for completion of simple and complex assessment and rehabilitation each year of the MCD. Third, the MCD extended the timeline for completion of the identification, delineation, assessment and rehabilitation of all Initial and Priority Areas as required by the PASARP to December 20, 2027. ECF No. 83 at 22.

In agreeing to a seven-and-a-half-year extension, the County identified that, specifically, the Shoal Creek trunk sewer project—deemed the "critical path" because it was anticipated to take the longest of all the PASARP projects and therefore was the basis for the length of the schedule—was "anticipated to require 7.5 years under a *best-case scenario*." ECF No. 125-1 at 64 (emphasis in original). The County noted that the schedule provided did not account for additional complexities, such as if pre-engineering findings show that the anticipated path of the Shoal Creek trunk could not accommodate parallel trunk sewers. ECF No. 125-1 at 63–64 ("This schedule does not include a margin for error or additional time to address currently unplanned for conditions, which may be discovered as project planning continues.").

The PFL program, PASARP deadlines, and MLF commitments established in the MCD are the impetus for the County to seek a second modification of the Consent Decree. Unlike the delays after entry of the 2011 Consent Decree, the County has worked diligently to make substantial progress under the MCD. *See* ECF Nos. 137-1, 153-1. As of the April 2025 Status Conference, the County has Adequately Fixed 185 out of 255 total PFL sites, and 51 out of the 70 remaining are anticipated to meet their MCD deadlines.  Declaration of Brad Kleckley (hereinafter "Kleckley Decl.") Exhibit 2 at ¶ 7.[1] The County is asking to modify the deadlines for only 15 PFL sites.[2] Based on new analysis, six of the PFL sites are projected to be Adequately Fixed using interim measures by the end of 2027, including the PFL sites with the largest volume of SSOs. Kleckley Decl. at ¶ 38.

The County exceeded MLF requirements in 2019/2020, 2021, 2022, 2023, and 2024, surpassing the 2027 milestones for simple pipe review and complex pipe design several years ahead of schedule.  Declaration of Greg Harrison (hereinafter "Harrison Decl.") Exhibit 3 at ¶ 11. Under Plaintiffs' interpretation of the MLF requirement, the County anticipates in 2025 that it will miss the 198,000 linear feet

---

[1] The County is not seeking deadline extension requests for four PFL sites associated with small diameter projects.

[2] Fourteen PFL sites are associated with the Snapfinger Basin, and one PFL site is associated with a small-diameter project.

("LF") requirement for complex rehab by approximately 4,000 LF. *Id*. at ¶¶ 14-15. Under the County's interpretation, the MLF requirement would be timely met. *Id*. at ¶ 16.[3]

At the January 30, 2025 status conference, Plaintiffs requested and the Court ordered the County to submit a revised plan pursuant to Paragraph 8(j) of the MCD describing the County's current plans for addressing 14 PFL sites. The County did so and submitted its detailed 8(j) plan (the "8(j) Plan") (ECF No. 148 at 13-66) to Plaintiffs on March 10, 2025, shortly after the DeKalb County Board of Commissioners secured funding by voting to approve a water and sewer rate increase of ten percent annually for each of the next ten years, with the first increase starting in July 2025.[4]  The 8(j) Plan provided a detailed description of the projects the County identified to Adequately Fix the 14 PFL sites, a proposed timeline (including

---

[3] The MLF commitments were inserted in the PASARP section of the MCD, however, milestone commitments for the first two years (2019/2020 and 2021) included rehabbing linear footage from projects *outside* of the PASARP when rehabbing that linear footage affected PFL sites. *See* ECF No. 83 at 82–83 (Task Nos. 3, 5, 6, 7, 13, 21, 23, 35, 36). Despite agreeing in the MCD to include non-Priority area PFL projects in the calculation of MLF as described in the Appendix E project lists, Plaintiffs have now taken the position that the County may not continue to count similar PFL projects toward MLF requirements in subsequent years. *See* Attachment A to Harrison Decl.

[4] This approved rate increase will generate roughly $4.2 billion to fund water and sewer infrastructure improvements.

interim project milestones), and a technical justification for the proposed schedules. As previously expressed to Plaintiffs and the Court during the January 30, 2025 status conference, for several technically justifiable reasons, the County projected that completion dates to Adequately Fix these PFL sites would extend to June 2037.[5]

In the 8(j) Plan, the County asked Plaintiffs to extend the near-term deadlines associated with the 14 PFL sites to December 2027 to allow time for the County to work with Plaintiffs on a Second Modification. This permissible extension of deadlines is critical as the County may begin accruing stipulated penalties as early as September 2025 without these extensions.

The County has made significant and measurable progress under the MCD. In contrast, negotiations concerning revisions to the MCD timelines have stalled as Plaintiffs have been unwilling to meaningfully engage with the County to discuss extending the September 2025 PFL deadlines or to negotiate a Second Modification of the Consent Decree. In light of the lack of progress towards an agreement, the Court permitted the County to file a motion for modification under Rule 60(b). ECF No. 157 at 63:10-15.

---

[5] The County reviewed and submitted to the Agencies over 4,000 pages of technical documents that provide the background and engineering support for this revised 8(j) Plan. *See* ECF No. 148 at 67-69.

Accordingly, and as permitted by the Court, the County submits this motion for a modification to the MCD because application of certain PFL deadlines, the deadline to complete the PASARP, and MLF milestones are no longer equitable when applied prospectively, and the existing facts and conditions justify relief. Fed. R. Civ. P. 60(b)(5), (6).

## LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) allows the Court to relieve a party from a final judgment or order, including existing consent decrees, where "applying it prospectively is no longer equitable" and for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(5), (6).

The Supreme Court has recognized that certain consent decrees are entered into under circumstances that are tentative or subject to change, therefore warranting revision. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378-80 (1992). The Court in *Rufo* emphasized the necessity of "the traditional flexible standard for modification of consent decrees." *Id*. at 379.

While the Supreme Court applied this standard to modification of institutional reform consent decrees, the Eleventh Circuit has applied this test in other contexts, including decrees concerning Clean Water Act matters. In *Sierra Club v. Meiburg,* the Court held that the underlying court's authority to modify a Clean Water Act consent decree is "subject to the constraints set out in the *Rufo* decision." 296 F.3d

8

1021, 1033 (11th Cir. 2002) (rev'd on other grounds); *see also Florida Wildlife Federation, Inc. v. McCarthy*, 2014 WL 51360 (N.D.Fla. 2014) (stating that while the Clean Water Act consent decree at issue did not meet the description of an institutional reform case, "the *Rufo* analysis of Rule 60(b) plainly applies here").

Other Circuits have done the same. *See U.S. v. Wayne, County, Michigan*, 369 F.3d 508, 513 (6th Cir. 2004) (finding that when the moving party demonstrates a significant change in factual circumstances, the court must consider whether the modification is suitably tailored); *see also Cronin v. Browner*, 90 F.Supp.2d 364, 370 (S.D.N.Y. 2000) (applying the *Rufo* standard to modification of a consent decree).

Further, courts have applied the *Rufo* test and granted modifications to sanitary sewer consent decrees specifically. For example, in *USA v. City of Portsmouth*, the Court applied the *Rufo* standard to modification of a consent decree and granted a modification to extend the deadline for upgrades to the sewer system. Case No. 09-cv-283-PB (D.N.H. Feb. 15, 2013).

*Rufo* established a two-prong test for consent decree modification under 60(b)(5). 502 U.S. 367, 383 (1992). The first prong requires that the party seeking modification "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id*. at 383. To satisfy this requirement, the party must show either that "factual conditions make compliance

with the decree substantially more onerous" *or* "enforcement of the decree without modification would be detrimental to the public interest*." Id*. at 384 (emphasis added). Importantly, the change of circumstances does not need to be unforeseeable. *Id.* at 385.

Once a party meets this standard, the second prong of *Rufo* requires the Court to then "consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.* If both prongs are satisfied, the court may approve the consent decree modification. Approval of a consent decree modification is reviewed under an abuse of discretion standard. *Sierra Club*, 296 F.3d at 1023.

## ARGUMENT

### I.    The significant change in circumstances since 2021 warrants further modification of the MCD.

The County's obligations under the Consent Decree have proven to be far more challenging than originally anticipated. As the operator of Georgia's largest public wastewater utility—an aging infrastructure system with over 2,600 miles of sewer pipes, much of it located in densely populated and environmentally sensitive areas—the County faces extraordinary challenges. The effort to eliminate SSOs and attain regulatory compliance requires ongoing technical analysis and the management of massive, multi-phase construction projects, which carries risks associated with new information learned through the engineering design process,

contractor and supply availability, and project execution. Declaration of Dr. Iris Tien (hereinafter "Dr. Tien Decl.") Exhibit 4 at ¶¶ 12-14. The current projected scope of projects required to Adequately Fix certain capacity-limited PFL sites and complete rehabilitation under the PASARP has significantly grown in complexity since MCD entry.[6]

At the time of MCD entry, the County projected it could meet the extension to complete the rehabilitation requirements under the PASARP by adding capacity via parallel relief sewers on the trunk sewers and constructing at least one in-basin storage tank.[7] Kleckley Decl. at ¶ 12. These projects were expected to Adequately Fix several PFL sites, and their completion would contribute toward MLF commitments. Kleckley Decl. at ¶ 17. The County has since discovered through the engineering design process that parallel relief sewers are not recommended for any of the Shoal Creek trunk sewer projects. Kleckley Decl. at ¶ 18. The trunk sewers were not only in poor condition generally, but also were found to contain significant

---

[6] This increased complexity is accompanied by a significant rise in costs to implement. In 2021, work under the MCD was projected to cost $1 billion. Despite investing more than $570 million in Consent Decree work to date, the County now estimates that completion will require approximately an additional $1.5 billion. Harrison Decl. at ¶ 20.

[7] Parallel relief sewers are new sewers located parallel to existing infrastructure in a separate trench, meaning that all segments of the relief sewer can be constructed concurrently. Kleckley Dec. at ¶ 16.

issues with alignment, slope, site constraints, and soil cover, which, when evaluated in combination, rendered parallel relief sewers unfeasible.[8] Kleckley Decl. at ¶¶ 18-27; Dr. Tien Decl. at ¶¶ 18-20. Given the required re-alignment, the County's engineers recommend that the Shoal Creek trunk sewer be constructed sequentially instead of concurrently due to considerations such as the impracticality of project-level bypass pumping and site constraints arising from the required realignment. Kleckley Decl. at ¶¶ 21-28, 47. Sequential construction of the Shoal Creek trunk sewer is the primary basis for the newly anticipated ultimate project completion date of June 30, 2037, which impacts the County's ability to "Adequately Fix" certain PFL sites by their current deadlines, timely complete rehabilitation required under the PASARP, and timely attain the remaining complex rehab MLF milestones.

Additionally, when the MCD was negotiated, the County anticipated needing at least one in-basin storage tank. Kleckley Decl. at ¶¶ 12, 33. While the County generally understood that the tank would need to be sited along the Shoal Creek trunk, it was only after further study that it became clear that the only hydraulically

---

[8] In 2017, the County completed a tiered assessment of sewer lines in the PASARP. The tiered assessment, an approach which was approved by Plaintiffs, identified potential structural concerns; however, the full scope of the pipe condition was not determined until after the engineering designers completed their condition assessment to include field verifications and accounting for issues such as slope, site constraints, and soil cover. These conditions made rehabilitation of the existing trunk sewer infeasible. Kleckley Decl. at ¶¶ 21-27.

suitable sites for in-basin storage were in highly residential areas. Kleckley Decl. at ¶ 34. After concerns arose regarding large sewage storage tanks in close proximity to citizens' homes, the County began evaluating alternative storage solutions. *Id*. Following this assessment, the County and its technical team determined that utilizing an existing storage tank at the Snapfinger Advanced Wastewater Treatment Facility ("AWTF") is the most practical approach and effective solution for wet weather storage. *Id*. at ¶ 35. ECF No. 148 at 16.

### a. The change in factual conditions makes compliance with the MCD substantially more onerous.

The change in these factual conditions makes compliance with the MCD substantially more onerous. In *USA v. City of Portsmouth*, the court granted a modification under the *Rufo* standard to extend the consent decree deadline for upgrades to the sewer system. Case No. 09-cv-283-PB (D.C. New Hamp. Feb. 15, 2013). The *Portsmouth* court found that the City had encountered two factually changed conditions requiring a deadline extension—unexpected geological conditions and a change in local budget procedures requiring a reallocation of resources—which satisfied the first prong of *Rufo* and warranted a modification of the consent decree deadline.

Here, the County's design engineers discovered that the existing trunk sewer conditions precluded the use of parallel relief sewers, and, for the Shoal Creek trunk,

the recommended alignment would not allow for project-level bypass pumping, making prospective compliance with certain aspects of the MCD practically impossible. Kleckley Decl. at ¶¶ 21-28, 47. *See* Dr. Tien Decl. at ¶¶ 22-25. This information was unknown—and could not have been known—during negotiation of the MCD because field constructability investigations for the parallel relief sewers were not scheduled to be completed until the County contracted for the engineering design work. Kleckley Decl. at ¶¶ 18-19. *See* Dr. Tien Decl. at ¶ 18.

It is typical that project designs and construction schedules for large, complex construction projects can shift with newly identified information. Kleckley Decl. at ¶ 6; Dr. Tien Decl. at ¶¶ 12-14. The County's planned construction schedule was based on information known at the time of MCD entry; however, by following the standard engineering design process, the County learned additional information about the construction requirements along the trunk sewers, which was unknown at the time of MCD entry. Kleckley Decl. at ¶¶ 18-19; Dr. Tien Decl. at ¶ 18.

Additionally, while the overarching changed circumstances impacted trunk sewer work and PFL sites in the Snapfinger Basin, the County also encountered significant changed circumstances at a PFL site in a non-Priority area. Harrison Decl. at ¶ 5. PFL Site No. 12, located at 1707 Childerlee Lane ("Childerlee PFL Site") is associated with the completion of a small diameter project to increase capacity. *Id*. While the County understood that the Childerlee PFL Site project would occur in a

14

developed area, it was not aware of the issues that would arise regarding the designed alignment. *Id.* at ¶ 6. First, an apartment complex owner engaged an attorney to deny access to the property since apartment residents would be significantly impacted. *Id*. After conversations with the owner, the County designed a second alignment, which required obtaining access to the parking lot of a data center. *Id.* at ¶ 7. Given the sensitive nature of data center servers, the owners signaled they would not permit the County to construct the sewer pipe on their property. *Id*. The County has now established a final alignment and anticipates easement acquisition without further issues. *Id.* at ¶ 8. However, the final alignment will encounter large amounts of unanticipated rock and will require 331 LF of hand tunneling and 2,602 LF of boring with a tunnel boring machine. *Id.* at ¶ 9. Given the realignments and unexpected rock, the County is no longer able to attain the September 22, 2025 deadline for this PFL site.

These cumulative significant changes in factual conditions identified by further engineering design work and analysis make compliance with the MCD substantially more onerous, clearly satisfying the first prong of the *Rufo* test. *See Florida Wildlife Federation*, 2014 WL 51360 at 6 (finding modification appropriate where reviewing new studies and analysis caused the state agency to adopt new nutrient criteria, and thus constituted a significant change in factual conditions).

### b. Enforcement of the MCD without modification would be detrimental to the public.

Here, the significant change in factual conditions alone would be sufficient to satisfy the first prong of the *Rufo* test. However, the County can also show that enforcement of the MCD would be detrimental to the public interest. This Consent Decree impacts more than 700,000 DeKalb County residents and ratepayers, making a Second Modification a matter of significant public concern. Under the MCD, starting this September, the County could begin accruing in the range of $100 million in stipulated penalties on PFL sites alone by the time construction is complete. Violation of the PASARP and MLF deadlines could accrue more than $20 million in additional stipulated penalties. Kleckley Decl. at ¶ 32. This potentially poses an enormous financial burden on the County, and therefore the public, for circumstances unplanned for at entry of the MCD.

The County is cognizant of the upcoming deadlines and remains committed to Adequately Fix as many PFL sites as quickly as possible. *Id.* at ¶ 7. *See also* Exhibit 1. Notably, while complete rehabilitation under the PASARP is projected for June 30, 2037, the County anticipates eliminating SSOs from all current PFL sites by March 31, 2034 through a combination of completing construction and using interim measures. However, given the significant amount of remaining work, the scope of which was unanticipated at MCD entry, extending the PFL and PASARP

deadlines and terminating MLF commitments is necessary and ensures significant public resources are invested in infrastructure to improve public health and the environment rather than used to pay penalties to the State General Fund or U.S. Treasury. Considering the Consent Decree's substantial impact on the public, the County should be afforded flexibility to continue working expeditiously towards finishing construction, consistent with sound engineering judgment, without being hindered by millions of dollars in penalties. *See Cronin v. Browner*, 90 F.Supp.2d 364, 372–73 (S.D. N.Y. 2000) (holding that flexibility surrounding a modification was warranted because of the potential harm to the public interest).

### c. The County identified potential risks to the schedule but did not anticipate these risks at MCD entry.

Plaintiffs may argue that these changed circumstances were anticipated at the time of MCD entry. As previously described, the County identified certain risks that could potentially impact the MCD timeline prior to entry but proceeded with the MCD in good faith with a roadmap to undertake parallel relief sewers and in-basin storage and therefore meet MCD commitments on the agreed upon timeline. Notably, the County is on track to meet deadlines for 93% of the PFL sites and has exceeded MLF commitments to date. Kleckley Decl. at ¶ 7.

In addition to pursuing those projects, the County has made substantial progress towards other MCD projects. For instance, the County has removed

approximately 1.4 million gallons per day of infiltration and inflow ("I/I") for those trunk sewer projects in 2025, and since 2017 the County has removed approximately 33.2 million gallons per day of I/I. Kleckley Decl. at ¶ 8. The County has also repaired over 38,000 linear feet system wide, including over 11,460 linear feet in 2025. *Id*. at ¶ 9.

Even if this Court finds that the changed circumstances might have been anticipated at the time of entry, the first prong of *Rufo* is satisfied where the MCD was agreed to in good faith, there was a reasonable attempt to comply, and relief should be granted under Rule 60(b). 502 U.S. at 368–69. And as described herein, relief should be granted under Rule 60(b) because application of the MCD as negotiated is no longer prospectively equitable.

## II.   <u>The proposed modification to the MCD is suitably tailored to the changed circumstances</u>

The second prong of *Rufo* requires the Court to "consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 385. The proposed modifications to the MCD are directly linked to the change in circumstances explained above. The County has collaborated with more than twenty engineering and construction firms on these projects, many of which are nationally recognized. Program Managers AECOM and Jacobs, along with numerous engineers, have designed the current plan through extensive modeling and

evaluation. Kleckley Decl. at ¶ 20. Based on supporting technical analysis, the proposed projects will Adequately Fix 14 PFL sites associated with the Snapfinger Basin, complete rehabilitation required in the PASARP, and Adequately Fix one PFL site associated with a small-diameter project.

There are two key project components required to resolve the 14 PFL sites: (1) increasing conveyance capacity in the trunk sewers and (2) providing wet weather storage. The County will achieve the necessary conveyance capacity by replacing six existing trunk sewer sections, totaling 103,300 LF, with upsized pipes. For wet weather storage, the County will use an existing 20-million-gallon storage tank at the Snapfinger AWTF. Construction must proceed downstream to upstream to avoid exacerbating downstream capacity issues. Kleckley Decl. at ¶ 29; Dr. Tien Decl. at ¶¶ 24-25.

To complete all rehabilitation required by the PASARP and to address the PFL sites, the County must construct approximately 155,278 LF (29.4 miles) of large diameter trunk sewer impacting approximately 178 acres of property and requiring 680 easements affecting 680 properties; 19 street, 6 highway, and 3 interstate crossings, requiring permitting and subsurface construction (tunneling or jack-and-bore); 98,816 cubic yards of rock excavation (equivalent in volume to 30 Olympic-sized swimming pools); and the removal of 11,123 eight inch diameter at breast

height trees, with additional smaller trees to be removed as necessary. Harrison Decl.

at ¶ 18.

To date, the County has invested over $570 million in projects related to the

Consent Decree. Harrison Decl. at ¶ 20. The County anticipates spending

approximately $1.5 billion to complete the Consent Decree work. *Id*.

Accordingly, the County respectfully requests the following relief, tailored to

the changed circumstances:

- **<u>Extend PFL site deadlines in accordance with Exhibit 1.</u>** Currently, fourteen

  PFL sites are projected to be Adequately Fixed by the completion of trunk sewer

  projects, thirteen of which have a current due date of September 22, 2025, and

  one of which has a due date of January 9, 2026. Under the existing MCD, the

  County could incur stipulated penalties in the range of $100 million for these PFL

  sites because of the timeline required to complete the trunk sewer projects given

  the changed circumstances requiring project sequencing. Furthermore, in

  addition to known PFL sites, there is the potential for additional PFL sites to arise

  due to these same trunk sewer capacity limitations. Accordingly, the County

  requests that any additional capacity-limited sites added to the PFL that are

  associated with trunk sewer projects have completion deadlines that align with

the corresponding trunk sewer project deadlines.[9]    Additionally, the MCD
deadline for the Childerlee PFL Site is September 22, 2025. The County projects
completion of this project July 31, 2027.

- **Extend the deadline to complete rehabilitation required by the PASARP to
June 30, 2037.** The MCD deadline to complete rehabilitation under the PASARP
is December 20, 2027. Given the change of circumstances and based on sound
engineering judgment, the County projects it will complete the critical path of the
Shoal Creek trunk, and therefore complete the rehabilitation of the PASARP, by
June 30, 2037. Other PASARP trunk sewer projects that are not associated with
PFL sites similarly need to be included in the June 30, 2037 extension to account
for contractor capacity since there are a limited number of companies that can
manage projects of this size, and the County is competing for these contractors
with other sewer systems in the Southeast. Harrison Decl. at ¶ 19.

- **Terminate Complex Rehab MLF Commitments.** Given that Plaintiffs have
rejected the County's method of calculating MLF that were set using non-Priority
Area projects, and that the parallel relief sewers and in-basin storage projects
were critical to satisfying MLF requirements, the County is unlikely to meet

---

[9]The County will continue to evaluate and pursue interim measures to reduce
spills while completing construction under the requested extended deadlines.

complex rehab MLF commitments in 2025, 2026, or 2027. Rather than achieve a specific linear footage of progress, the County requests the termination of complex rehab MLF commitments and projects and requests instead these be completed in the achievable timeframe in accordance with the schedule in Exhibit 1. This requested relief would require modification of certain provisions of the MCD (e.g. Reporting) in order for the MCD to be consistent with the requested relief, therefore, the County requests that this Court order modification of the MCD to be consistent with the relief ordered.

### III.    The County requests a $0 monetary civil penalty or in the alternative, a deferral on the determination of penalties until 2027.

The County has made and continues to make substantial efforts to comply with the MCD, is undertaking an effort to provide interim relief at certain PFL sites and continues to execute the 8(j) Plan. To the extent that the Court finds a monetary penalty warranted, the County requests that the Court withhold the penalty determination until December 2027 and determine what is equitable at that time, after the County has progressed on interim relief measures and after completing significant work under the 8(j) Plan.

### a.  The County requests a $0 monetary civil penalty.

The County proposes that this Court not impose a monetary civil penalty for several reasons. First, the need for the Second Modification to the Consent Decree

is due to an unanticipated change in conditions, and the penalty would accordingly serve no deterrent effect.[10]

Second, the County has already paid a $453,000 penalty under the Consent Decree and a $1.047 million penalty under the MCD. While those penalty amounts were likely consistent with EPA's municipal penalty policy, a third penalty under these circumstances is not warranted.

Third, the County is now committing $30 million to significant interim measures designed to reduce SSOs while the now more onerous and costly trunk sewer projects are underway.

The Court requested that the County assess "whether there is any interim fix that could...get at least some relief" for the PFL sites on Shoal Section 3A prior to 2034. ECF No. 157 at 65:24–25. The County anticipates that by constructing storage, reinspecting sewer lines, enhancing cleaning, and undertaking additional

---

[10] Other sewer consent decrees have been modified without the assessment of a civil penalty. *E.g.* Second Modification to Consent Decree, *USA v. City of Portsmouth*, Case No. 09-cv-283-PB (D.N.H Sept. 28, 2016) [Dkt. 66] (modifying technical requirements and extending compliance deadline without assessing civil penalties); First Amendment to Consent Decree, *United States v. City of Akron,* No. 5:09-cv-00272 (N.D. Ohio Sept. 20, 2016) [Dkt. 186] (modifying injunctive relief provisions and modifying schedule without assessing additional civil penalties); Second Material Amendment to Consent Decree, *United States v. Metropolitan St. Louis Sewer District*, No. 4:07-cv-01120 (E.D. Mo. Feb. 26, 2018) [Dkt. 166-1] (extending compliance deadlines without assessing civil penalties).

comprehensive rehabilitation to remove additional I/I, it will Adequately Fix six PFL sites (associated with the AWTF and Shoal Section 3B projects) by December 31, 2027 (prior to completion of final construction) and will address most, but not all, predicted spills at five PFL sites currently associated with Shoal Section 3A by December 31, 2027.[11] Kleckley Decl. at ¶¶ 36–43. That $30 million investment in temporary measures can be construed as a sufficient "penalty" and will benefit the public by reducing SSOs until construction is completed.

Fourth, any additional penalty would be excessive given the already ballooning costs of the Consent Decree—over $570 million spent to date and a projected $1.5 billion to complete construction—plus any additional costs associated with economic uncertainties such as tariffs, supply chain difficulties, and labor shortages. And finally, the County is supportive of paying the cost of a special master to give this Court and the public confidence that the County is doing everything reasonably possible to comply with the Consent Decree.

      **b. In the alternative, the County requests a deferral on the determination of penalties until 2027.**

---

[11] These PFL sites include No. 11 Melanie Court; No. 90 Fairlee Drive; No. 21 Miriam Lane; No. 26 Thrasher Circle; and No. 91 Toney Drive. Kleckley Decl. at ¶ 39.

In the alternative, should the Court find that an additional civil penalty is appropriate, the County requests that any assessment or calculation of such a penalty not be determined until December 2027—the end of the current MCD. This logical approach would allow the Court, with the assistance of a Court-appointed special master, to analyze actual costs and actual progress associated with Adequate Fixes and interim relief, to determine the appropriate penalty before imposing a penalty and avoids imposing a penalty prematurely before any deadlines have passed. This would enable the County to demonstrate that it is capable of performing the work it has committed to completing, and it will further allow the Parties and the Court to take into account the true impact of the interim measures the County will institute, allowing for a real-life assessment of actual progress and the amount of public financial resources spent performing the work.

## IV.    <u>Relief is also appropriate under Rule 60(B)(6).</u>

For the reasons set forth herein, in addition to granting relief under Rule 60(b)(5), relief is also appropriate under Rule 60(b)(6) which allows relief "for any other reason that justifies relief."

## <u>CONCLUSION</u>

For the reasons set forth herein, the County respectfully requests the Court grant this motion.

Respectfully submitted this 16th day of June 2025.

**TROUTMAN PEPPER LOCKE LLP**

*/s/ Charles E. Peeler*
Charles E. Peeler
Georgia Bar No. 570399
charles.peeler@troutman.com

Byron W. Kirkpatrick
Georgia Bar No. 396394
byron.kirkpatrick@troutman.com

E. Fitzgerald Veira
Georgia Bar No. 726726
fitzgerald.veira@troutman.com
*Attorneys for Defendant*
*DeKalb County, Georgia*

**TROUTMAN PEPPER  LOCKE LLP**
Bank of America Plaza
600 Peachtree Street, N.E., Suite 3000
Atlanta, GA 30308-2216,
Tel: 404-885-3000

**GREENBERG TRAURIG, LLP**

Richard J. Valladares
Georgia Bar No. 611066
valladaresr@gtlaw.com

Peter J. Andrews
Georgia Bar No. 019529
Peter.Andrews@gtlaw.com

Kristin M. Duke
Georgia Bar No. 319485
dukek@gtlaw.com

**GREENBERG TRAURIG, LLP**
Terminus 200, Suite 2500
3333 Piedmont Road, NE
Atlanta, Georgia 30305
Tel:  678-553-2100

**GREENBERG TRAURIG, LLP**

Christopher J. Neumann
(*admitted pro hac vice*)
neumannc@gtlaw.com

**GREENBERG TRAURIG, LLP**
1144 15th Street, Unit 3300
Denver, Colorado 80202
Tel: 303-572-6500

*Attorneys for Defendant DeKalb County, Georgia*

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

I hereby certify that the within and foregoing **MOTION FOR A SECOND MODIFICATION TO THE CONSENT DECREE AND INCORPORATED BRIEF IN SUPPORT THEREOF** was prepared using Times New Roman font (14 point), in compliance with Local Rule 5.1B.

This 16th day of June, 2025.

*/s/ Charles E. Peeler*
Charles E. Peeler

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that DeKalb County's **MOTION FOR A SECOND MODIFICATION TO THE CONSENT DECREE AND INCORPORATED BRIEF IN SUPPORT** was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

This 16th day of June 2025.

*/s/ Charles E. Peeler*
Charles E. Peeler