IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>and the STATE OF GEORGIA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 1:10-cv-04039-SDG |
| DEKALB COUNTY, GEORGIA | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT DEKALB COUNTY'S RULE 60(b) MOTION FOR A SECOND MODIFICATION TO THE CONSENT DECREE

The Court should reject Defendant DeKalb County's proposal to extend its final compliance deadline by nearly another decade because the County has not satisfied the standard in Federal Rule of Civil Procedure 60(b) for modifying the already-modified Consent Decree. Under *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992), the County must show both (1) a significant change in circumstances, and (2) that its proposed modification is suitably tailored to those changed circumstances. The County can do neither.

There is no significant change in circumstances. When the County agreed to the Modified Consent Decree, which gave it seven more years to comply, it fully anticipated the changes that it now argues justify a new, even longer modification.

1

Nor has the County made reasonable efforts to comply with the Modified Consent Decree. Rather, the County failed to take steps that it knew would be necessary to meet deadlines, and it failed to commit to or develop a suitable plan until it was too late. Finally, the fundamental public interest underlying the Modified Decree is unchanged: ensuring the County eliminates overflows of untreated sewage to streets, yards, and public waterways in the community as soon as possible.

Even if the County could show significant changes, its proposed modification is not suitably tailored to those changes. Its compliance schedule is much longer than necessary, and it proposes no penalty, despite repeatedly and knowingly failing to comply with court-ordered deadlines. The County's proposed modification would undercut the Modified Consent Decree's purpose to limit the sewage overflows threatening the health and welfare of the County's residents.

To be sure, the County's anticipated failure to comply means that a second modification is needed. But the proper way to address the County's lapses is for the Parties to negotiate a second modification, just as they did for the first modification, pursuant to Paragraph 105 of the Consent Decree. Thus, the United States requests that the Court keep the existing Modified Consent Decree in place and order the Parties to negotiate a reasonable modification over the next six months. Maintaining the Modified Consent Decree during a limited period of negotiations will motivate the County—which has twice now failed to do the work

needed to comply with consent decree deadlines—to find ways to expedite its remediation, and a time-limited negotiation period will allow the Parties to agree on an appropriate resolution of their current dispute.

## BACKGROUND

After agreeing to the 2011 Consent Decree, the County has had ample time to assess its sewer system, pick a plan, and be on track to complete it by the 2027 deadline. Instead, it was not until 2017 that the County assessed the priority areas of its system. Then in 2021, Plaintiffs agreed to give the County seven *more* years. But the County has still failed to prioritize work to reduce the millions of gallons of untreated sewage that spill each year into the County's parks, neighborhoods, and waterways, including waters of the United States. And now in 2025, after years spent evaluating and reevaluating alternatives, the County has selected a plan that will require nearly another decade from the existing 2027 deadline to complete.

## I.    The County's Failure to Meet the Decree Deadline Led to the First Modification

In December 2011, the Court entered a Consent Decree resolving the County's alleged Clean Water Act violations. ECF 39.[1] The Decree required the County to implement by June 2020 a Priority Area Sewer Assessment and

---

[1] For papers previously docketed, pincites refer to the page identification numbers assigned by the Electronic Case Filing ("ECF") system.

Rehabilitation Program[2] ("Priority Areas Program") to address wet-weather

capacity and structural problems causing sanitary sewer overflows. *Id.* ¶¶ 35–37.

The County did not meet this deadline. Its former CEO stated that until 2017 the

County's Consent Decree work was "in large part, neglected." ECF 118-1 at 8.

In light of its failure, the County negotiated with Plaintiffs a Consent Decree

modification, which the Court entered in September 2021. ECF 83. Under the

Modified Consent Decree, by December 2027 the County must: (1) implement the

Priority Areas Program; (2) review, design, or rehabilitate a minimum linear

footage of pipe each year; and (3) adequately fix a "Priority Fix List" of sites with

recurring sewage overflows. ECF 83 at 21–28. The list at first had 103 sites, with

deadlines to fix half of them in September 2023 and the rest in September 2025.

ECF 83 ¶ 8(j) (providing that the County could later add sites to the list with

separate deadlines up to December 2027). The County may seek an extension to no

later than December 2027 for up to twenty-one sites. *Id.* at 25–26.

## II.    The County Repeatedly Proposed Options and Then Changed and Evaluated Them, Instead of Implementing Interim Measures to Reduce Frequency and Volume of Sewer Overflows

In February 2021, the County requested that Plaintiffs extend the deadline

for twenty of the original 103 Priority Fix List sites from September 2025 to

---

[2] This program required the County to rehabilitate any already identified priority areas, and identify and rehabilitate additional priority areas based on age and condition of pipes, history of sewer overflows, and other factors. ECF 39 ¶ 35.

December 2027 so the County could improve wet-weather storage and conveyance capacity.[3] ECF 125-1 at 111–12. Many of these sites were associated with the Shoal Creek Trunk Line. The County expected that the Shoal Creek projects would take the longest and has therefore used them to determine its scheduling. Mot. at 4.

The County described its plans to achieve the requested deadlines. To address capacity constraints that have caused large, recurring overflows, the County planned either to construct a new parallel relief sewer or else replace existing pipes with a new larger diameter sewer. ECF 125-1 at 112. And to store sewage during wet-weather events, the County proposed in-ground storage. The County said the December 2027 deadline accounted for several "complex factors" associated with constructing large diameter sewers. *Id.* at 115. The County also recognized potential community opposition to these projects and that community outreach would be "necessary" for successful implementation. *Id.*

In its February 2021 request for extensions of deadlines to fix the priority sites, the County failed to include the details and technical justification that the Modified Consent Decree required. *See* attached Declaration of Jairo Castillo ("Castillo Decl.") ¶ 23. Accordingly, Plaintiffs did not approve the request. *Id.*

---

[3] While the Court entered the Modified Consent Decree in September 2021, Plaintiffs lodged the Decree in October 2020, which was before the deadline for the County to request Priority Fix List extensions (February 2021).

In 2023, the County shifted course by telling Plaintiffs that the most feasible in-basin storage locations were unlikely to receive community support, ECF 118-1 at 115, even though the County did not do the community outreach it said before was needed. The County also raised alternatives that may require more time, and the County said it would likely revise its extension requests. *Id.* at 118. At the same time, the County claimed to be "mindful" of the December 2027 deadline. *Id.* Yet it did not submit a revised extension request to Plaintiffs.

Instead, in May 2024, Plaintiffs started asking the County whether it would meet its December 2027 deadline. It was not until August 2024 that the County definitively told Plaintiffs it could not. The County also said that, despite Plaintiffs' requests to implement interim measures to lessen effects of sewer overflows, those measures were not feasible for the Priority Fix List sites at issue. ECF 125-1 at 42–54. Because the County failed to admit in its October 2024 quarterly report to the Court, ECF 117-1, that the County expected to miss the 2027 deadline, Plaintiffs requested a status hearing, which the Court held in January 2025. ECF 118.

## III.    Just two Years Before the 2027 Deadline, the County Proposed Another New Plan that Still Lacks Interim Measures and Would Take the County Almost a Decade to Implement

In March 2025, as ordered by the Court at the January 2025 status conference, the County sent Plaintiffs a superseding request to extend certain Priority Fix List deadlines along with a remediation plan ("March Plan"). ECF 148

at 14–66. The March Plan's proposals were new to Plaintiffs, and they included work extending to 2037. *See* Castillo Decl. ¶ 34. A key element of this plan is replacing six sections of trunk sewer lines—including the Shoal Creek Trunk Sewer's three sections—with larger-diameter pipes.

Plaintiffs denied the extension request because the March Plan fixed none of the Priority Fix List sites at issue by the required deadline of December 20, 2027. *Id.* ¶ 30; *see* ECF 83 at 25–26. In a meeting with the County, Plaintiffs expressed concerns with the plan—for example, that it lacked interim measures to reduce the flow or volume of sewer overflows while it requested another ten years to address Priority Fix List sites. Castillo Decl. ¶ 31. In two technical team calls since the Court's April 2025 hearing, the County said it now plans to use interim relief measures to adequately fix three of the remaining Priority Fix List sites at issue by December 31, 2027. ECF 159-2 at 26 (Declaration of Brad Kleckley, Att. C).

On June 16, 2025, the County filed its Rule 60(b) motion. ECF 159.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 60(b)(5) and (6), the Court may relieve a party from a final judgment when "applying it prospectively is no longer equitable" or for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(5), (6). A consent decree is "a judgment entitled to a presumption of finality," and any party seeking modification "has a high hurdle to clear and the wind in its face."

*Sierra Club v. Meiburg*, 296 F.3d 1021, 1034 (11th Cir. 2002). A party may obtain relief under Rule 60(b)(5) when it is no longer equitable for the judgment to have prospective application—"not when it is no longer convenient to live with the terms of a consent decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992).

Under the Supreme Court's application of Rule 60(b)(5), the County must first show that a "significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383. A significant change in facts or law can warrant a modification if it makes decree compliance (1) "substantially more onerous," (2) "unworkable" due to "unforeseen obstacles," or (3) "detrimental to the public interest." *Id.* at 384. But ordinarily a modification should be denied if a party relied on events that "actually were anticipated at the time it entered into a decree." *Id.* at 385. If the moving party anticipated such changes but still agreed to the decree, then that party must satisfy a "heavy burden" to show that "it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Id.*

If the County shows significant changes warranting a revision, then the Court must determine if the proposed modification is "suitably tailored" to those changes. *Id.* at 391. "A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires." *Id.*

Finally, the catchall provision in Rule 60(b)(6) can provide relief based only on grounds not covered by Rule 60(b)(1)–(5). *BLOM Bank SAL v. Honickman*, 145 S. Ct. 1612, 1619 (2025). Even then, a party seeking relief under Rule 60(b)(6) must show "extraordinary circumstances" and that it is "faultless." *Id.* at 1620.

## ARGUMENT

### I.    The County Has Not Shown a Significant Change in Circumstances under Rule 60(b)(5)

Applying *Rufo*, several courts have denied relief under Rule 60(b)(5) when the moving party anticipated the changes claimed to support modification of a consent decree. *E.g.*, *United States v. City of Akron*, 2024 WL 895320, at *6 (N.D. Ohio Mar. 1, 2024) (cost increases did not justify modification of similar consent decree partly because the parties considered future cost increases before decree entry); *United States v. Asarco Inc.*, 430 F.3d 972, 982 (9th Cir. 2005); *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 220 F.3d 241, 248 (4th Cir. 2000); *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1152 (6th Cir. 1992). Here, the changes cited by the County were anticipated, and the proposed modification would be detrimental to the public interest—delaying relief to the residents of DeKalb County by another ten years on top of already delayed relief. The County anticipated the purported changes and has not made reasonable efforts to comply

with the Modified Consent Decree, so the County has not met its "heavy burden" to show another modification is warranted. *Rufo*, 502 U.S. at 385.[4]

### A.    Neither the Sewer Replacement Nor Community Pushback Were Unforeseen, Significant Changes in Circumstances.

Under Rule 60(b)(5), a change in facts or law can justify modification. The County has not argued any change in law, so this case is unlike *Fla. Wildlife Fed'n, Inc. v. McCarthy*, which mainly involved changes in law. 2014 WL 51360, at *6 (N.D. Fla. Jan. 7, 2014); *see* Mot. at 15. Here, the County relies on two purported factual changes: (1) its decision to replace its trunk sewers instead of using parallel relief sewers, and (2) unsubstantiated "concerns" of residents about in-basin storage. Mot. at 10–15. Neither change is like the changed factual conditions in *United States v. City of Portsmouth*, where the United States and Portsmouth agreed a modification was warranted partly due to unexpected volumes of rock formation. 2013 WL 595929, at *4 (D.N.H. Feb. 15, 2013); *see* Mot. at 13. By contrast, the County anticipated both alleged changes: before seeking entry of the Modified Consent Decree in 2021, the County planned on sewer replacement as a

---

[4] As for Priority Fix List site 12, which has a September 2025 deadline, the County now plans to finish the work to fix it by July 2027 due to alleged difficulties. Mot. at 14–15; ECF 159-1 at 3. So no modification is needed. The County may submit an extension request for this site—together with the required information (project description, timeline, and technical justification)—because the anticipated project completion date is before December 2027. *See* ECF 83 at 21–28 (Paragraph 8(j)).

remediation option, and it said community outreach was necessary because of possible pushback to in-basin storage. *See Rufo*, 502 U.S. at 385.

### 1. The County anticipated sewer replacement by proposing it as an option for remediation.

The County says it "discovered" that parallel relief sewers were "not recommended" only after entry of the Modified Consent Decree, so instead the County now plans to replace the trunk sewers. Mot. at 11. But the County's Basis of Design Report admits that it had most of the information it needed to evaluate the pipes' condition after an assessment in 2017. Castillo Decl., Exh. 2 at D-1. This assessment covered all but four of the Priority Fix List sites subject to the County's extension requests. *See* Castillo Decl. ¶ 42. And by 2020, the County "anticipated" the possibility of "complete replacements of the existing trunk sewer with larger pipes, generally in new alignments." ECF 125-1 at 29; *see also* Castillo Decl. ¶ 38 (County's 2020 optimization study recommended replacement).

Indeed, in its February 2021 extension request, the County wrote that it would address capacity constraints *either* with parallel relief sewers *or sewer replacement*. ECF 125-1 at 112. The County also stated in that request that its schedule—including the December 2027 final compliance date—accounted for "complex factors associated with construction of large diameter sewers." *Id.* at 115. The County now says that sequential—rather than concurrent—sewer replacement is the "primary basis" for its proposed June 2037 deadline. Mot. at 12.

But whether the work would happen sequentially or concurrently, the County

planned on sewer replacement as an option in 2021, while aware of the December

2027 deadline and of complex factors involved in sewer replacement projects.

### 2. The County anticipated community pushback on its in-basin storage plan.

The record also contradicts the County's assertion that it did not anticipate

community pushback on its in-basin storage proposal. *Cf.* Mot. at 12–13. In

February 2021, the County acknowledged that community support for in-basin

storage and the trunk sewer construction projects would be necessary but

challenging to obtain, thus requiring a substantial community outreach program.

ECF 125-1 at 115. The County, therefore, commissioned the development of a

robust outreach plan but never implemented that plan. ECF 125 at 17; Castillo

Decl. ¶ 41. So potential community opposition was not a change in facts—instead,

the County anticipated it but then took no steps to mitigate or address it.

### B. None of the Alleged Changed Circumstances Justifies a Modification on the Basis of the Public Interest.

The County also argues a modification is warranted under *Rufo* because

compliance with the Modified Consent Decree is not in the public interest. But the

opposite is true. The County's proposed modification is itself "detrimental" to

several public interests. *Rufo*, 502 U.S. at 384. First, granting a ten-year extension

is also a ten-year extension of the ongoing threat to the health of the County's

residents posed by several million gallons of untreated sewage spilling from the Priority Fix List sites into public areas, including yards, and waterways near parks, playgrounds, and schools. *See* Castillo Decl. ¶ 16. Contact with raw sewage can cause infectious diseases and other illnesses, especially for young children and other vulnerable populations. ECF 118-2 ¶¶ 4–10.

When deciding whether to modify a consent decree aimed at protecting the environment or public health, courts have prioritized the choice that best achieves those protections. For example, the County cites a case that modified a decree to give the government more time to propose an environmental protection regulation, but that was because the court prioritized the need to "minimize[] adverse environmental impact." *Cronin v. Browner*, 90 F. Supp. 2d 364, 374 (S.D.N.Y. 2000); *see also United States v. Caterpillar, Inc.*, 227 F. Supp. 2d 73, 86 (D.D.C. 2002) (consent decree modification not warranted where decree "will still offer substantial public health benefits"). The County's proposed modification would fail to prioritize public health protections by allowing sewage overflows to persist in the County's communities for longer than necessary.

Another relevant public interest is the need to treat all municipal defendants equally and fairly. EPA Region 4 has several sewer system consent decrees with other municipalities throughout the Southeast, including some with greater funding

challenges than the County.[5] Unlike the County, most of these other defendants have been open with EPA about their progress in implementing decrees and with any challenges that arise, which is essential to consent decree implementation and modification if necessary. *See* Castillo Decl. ¶ 40. Granting the County's motion—after it did not work on projects under the Modification for four years—is unfair to these other defendants.

Accepting the County's proposed modification would also undermine the public interest in ensuring that court orders have meaning and force. The County already missed the original Consent Decree's deadlines based, in large part, on neglect. ECF 118-1 at 8 (status report of former CEO). Now it seeks a second modification to accommodate a plan it submitted years after it should have commenced work under the Modified Consent Decree. If the County's motion is granted, the County may well come back again in five years seeking another modification and other defendants may take notice. *Cf. Johnson v. Florida*, 348 F.3d 1334, 1346–47 (11th Cir. 2003) (likelihood of recurrence of violations was partial reason not to terminate a consent decree; and analysis of decree modification and termination are similar).

---

[5] *United States v. Greenville*, 4:16-CV-00018 (N.D. Miss. 2016); *United States v. Winchester Mun. Utilities*, 5:06-CV-00102 (E.D. Ky. 2007); *United States v. Jackson*, 3:12-CV-00790 (S.D. Miss. 2012).

### C.    The County Has Not Met its Heavy Burden to Show It Made Reasonable Efforts to Comply.

In a passing remark without any supporting argument, the County notes that even if it anticipated the purported changes, a modification is still warranted if the County agreed to the Modified Consent Decree in good faith and made a reasonable attempt to comply. Mot. at 17 (citing *Rufo*, 502 U.S. at 368–69). But the County did not make a reasonable effort to comply and certainly has not met its "heavy burden" of showing such an effort. *Rufo*, 502 U.S. at 385.

The County spent almost eight years since the 2017 assessment evaluating varying plans—while sewage spilled into communities, yards, and streets—rather than picking and implementing a plan to bring relief to those communities by timely addressing all the Priority Fix List sites. The County did not raise its inability to meet the December 2027 deadline with Plaintiffs until they asked about it in 2024, and the County did not raise it with the Court until Plaintiffs requested a status conference. Even then, the County did not present a compliance plan to Plaintiffs until prompted by the Court's January 2025 Order. And the March 2025 Plan contained dramatic shifts from its prior plans. Castillo Decl. ¶ 34.

The County started implementing its new plan months before discussing it with Plaintiffs. *See* Castillo Decl. ¶¶ 39–40; *cf. United States v. Tennessee*, 986 F. Supp. 2d 921, 936 (W.D. Tenn. 2012) (party failed to make reasonable efforts under *Rufo* in part by prematurely constructing a facility contrary to a settlement's

requirements). And after failing to do the community outreach the County said was "necessary," ECF 125-1 at 115, the County said its original plan was no longer feasible based in part on "presumed" community opposition, ECF 125 at 17. *Cf. Tennessee*, 986 F. Supp. 2d at 936 (a party's efforts were unreasonable partly because it failed to complete a decree requirement after delaying a step the party itself had said was necessary); *Thompson*, 220 F.3d at 248 (defendants failed to use "reasonable effort" under *Rufo* by not evaluating location for a housing complex required by decree). None of this shows reasonable efforts to comply with the Modified Decree.

Because the County anticipated the purported changes underlying its requested modification and because the County has not met its heavy burden to show it made reasonable efforts, the changes in circumstances cannot support granting a second modification.[6]

## II.    The County's Proposals are Not "Suitably Tailored" to the Allegedly Changed Circumstances

Even if the County could show a significant change in circumstances, its proposed modification is not "suitably tailored to resolve the problems created by" that change. *Rufo*, 502 U.S. at 391. To be suitably tailored, a modification cannot

---

[6] The County's points about "standard engineering practice" are a red herring. Mot. at 14. If such practice justified modification, then deadlines in all decrees with engineering projects would be meaningless.

violate a consent decree's "basic purpose." *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1564 (11th Cir. 1994) (quoting *Rufo*, 502 U.S. at 391).[7]

The Consent Decree's purpose is for the County to use its "best efforts" to prepare and implement plans to eliminate the sewer overflows that threaten the health of the County's residents. ECF 39 ¶ 6. This purpose would be undermined by the County's unnecessarily lengthy plan and its proposed zero-dollar penalty. The County has also failed to explain how two other aspects of its modification are suitably tailored to the purported changes: (1) terminating the complex rehabilitation minimum linear footage requirement, and (2) setting timelines as far out as 2036 for projects not associated with Priority Fix List sites.

### A.    Spending Nearly a Decade on the Shoal Creek Trunk Line Projects is Not Justified by the Alleged Changes in Circumstances.

Even assuming the County proceeds with its planned trunk sewer replacement, based on the County's data reviewed by the United States, the County has not shown why 2037 is the fastest timeline for the "critical" Shoal Creek trunk line, which has three sections and accounts for several Priority Fix List sites at issue. Mot. at 4 (proposing that the Shoal Creek projects would take the longest). The United States estimates that the County can finish the Shoal Creek trunk sewer

---

[7] *See also Akron*, 2024 WL 895320, at *6 (sewer system case; modification may not "fundamentally alter the [parties'] bargain"); *Ctr. for Biological Diversity v. Pruitt*, 2017 WL 3782696, at *3 (N.D. Cal. Aug. 31, 2017) (modification may not defeat a decree's "core purpose").

project by around 2033—four years ahead of the 2037 deadline proposed in the County's motion. *See* Castillo Decl. ¶¶ 6, 64.f. Thus, the 2037 deadline is not suitably tailored—equity requires giving the County only the time it truly needs by using its best efforts, no more. *See Rufo*, 502 U.S. at 383. Giving the County until 2037 would unjustly reward its extensive track record of failing to prioritize eliminating sewage overflows as quickly as possible.

The County says the 2037 deadline is required because it must replace the Shoal Creek sections sequentially instead of concurrently, which would be faster. ECF 159-2 ¶¶ 24, 27, 31. Yet the County had previously planned on simultaneous construction, Castillo Decl., Exh. 2 at 6-2, and now appears to agree that concurrent construction is "technically possible." ECF 159-2 at 25. The United States' considered view is that the County can construct at least substantial parts of the first two sections concurrently, saving roughly four years when combined with interim measures. Castillo Decl. ¶¶ 6, 64.f.

The County has raised several reasons not to use concurrent construction, but each lacks merit. *See id.* ¶ 53. First, the County mentioned possible additional permitting, Castillo Decl., Exh. 7 at 6, but the County should be ready to obtain any required permits. Second, the County alluded to possible loss of "contractor continuity" over time, *id.*, but concurrent construction reduces this concern by taking less time. Third, the County asserted that construction access paths would

have to be built and restored twice, leading to added disruption to residents. *Id.* But any extra work or disruption necessary for concurrent construction does not justify needless delays in eliminating raw sewage overflows. Finally, the County's warning that it may struggle to retain contractors rings hollow when the County has already hired more than a dozen engineering firms on this case, including some of the largest engineering firms in the world (AECOM, Atkins Realis, Jacobs, Stantec, etc.). *See* ECF 159-3 ¶ 19; ECF 159-2 ¶ 37.

Even without concurrent construction, the County could still shorten the timeline by at least three years by using interim measures to address two of the final Priority Fix List sites—No. 59 (Deerwood Drive) and No. 247 (Melanie Court). Castillo Decl. ¶¶ 57–59. The County says fixing these two sites will extend the project timeline three years from 2034 to 2037. According to the County's own sewer overflow records, these sites overflow infrequently and in low volumes. *Id.* ¶ 58. Because of the low volume of these overflows, the County could implement interim measures, such as temporary storage, at these locations to reduce sewer overflows while upstream construction progresses. *Id.* One of the County's declarants concedes that all these sites can be fixed by using interim actions such as offline storage. ECF 159-2 ¶ 39.

Finally, the County has the financial capacity to complete the remediation by 2033. *See* attached Declaration of Gail Coad ("Coad Decl.") ¶¶ 28–49. The

estimated $1.5 billion needed to implement the remediation will have a low financial impact on the County and an average impact compared to other communities nationwide. *See id.* ¶¶ 38–42.

**B.   The County Fails to Explain Why Cutting the Complex Rehabilitation Minimum Linear Footage Requirement or Spending Nine Years on Other Trunk Projects are Suitably Tailored.**

The County has not shown why two other aspects of its proposed modification are suitably tailored to the alleged changes.

First, in terms of the County's request to terminate the minimum linear footage complex rehabilitation requirement, the County mentions the purported changes in circumstances without explaining how eliminating this requirement is suitably tailored to those changes. Mot. at 21–22. The County also mentions that it disagrees with Plaintiffs on how to interpret the Modified Consent Decree language setting this requirement, but again the County does not explain how this disagreement justifies eliminating the requirement altogether. *Id.* Nor has the County invoked dispute resolution on this issue. In fact, the minimum linear footage requirement serves the critical purpose of preventing stormwater and groundwater from leaking into the sanitary sewer system, thereby adding to capacity constraints. *See* Castillo Decl. ¶¶ 10 n.5, 63.

Second, the County does not say why it needs until 2036 to complete four projects to address trunk sewer capacity restrictions not associated with Priority

Fix List sites. ECF 159-1 at 4. In fact, the County does not explain the substance of these projects or the bases for their timelines. *See* Castillo Decl. ¶ 64.f.

### C. The County's Requests for A $0 Penalty and Suspended Stipulated Penalties Until 2027 Are Not Suitably Tailored to the Purported Change in Circumstances Because They Violate the Basic Purpose of the Decree.

The County must be motivated to comply with the Modified Consent Decree and fix its wastewater infrastructure. A $0 penalty and suspending stipulated penalties for noncompliance are not suitably tailored because they violate the Consent Decree's purpose by removing the incentive for the County to use its best efforts to comply. *See Seibels*, 31 F.3d at 1564 (quoting *Rufo,* 502 U.S. at 391). Even the Modified Consent Decree's penalty of $1,047,000 plus stipulated penalties for sanitary sewer overflows and missed deadlines have proven insufficient at inducing compliance. ECF 83 at 10, 33–38. Since the Modified Consent Decree was entered in 2021, the County has taken few actions to mitigate the sewer overflows from the Priority Fix List sites for which it has sought extensions—other than propose a plan that did not meet the terms of the Decree. *See* Argument, Section I.C, *supra*.

In sum, the County's proposal of a $0 penalty and suspended stipulated penalties through 2027 is not suitably tailored to the purported change in circumstances and does nothing to ensure the County complies with a new

schedule if the Court elects to adopt a revised schedule. *See Seibels*, 31 F.3d at
1564; *Pruitt*, 2017 WL 3782696, at *3.

## III.    The County Cannot Justify a Second Modification Under the Catchall Provision in Rule 60(b)(6)

In one sentence, the County argues that Rule 60(b)(6) justifies a second

modification, but it does not. First, the County must assert grounds other than those

covered by Rule 60(b)(1)–(5), but it provides no basis for relief beyond the alleged

changes pursuant to Rule 60(b)(5). *See Honickman*, 145 S. Ct. at 1619.

Even if Rule 60(b)(6) applies, the County has not shown "extraordinary

circumstances" or that it is "faultless." *Id*. In *Honickman*, the Supreme Court

denied a Rule 60(b)(6) change partly because of the parties' "deliberate choices"

not to seek prior, available avenues for relief. *Id.* at 1622. Similarly, the County has

made such little progress on the Priority Fix List sites at issue partly due to its

deliberate choices to dramatically change plans two years before the deadline, to

not conduct the necessary community outreach, and to not use interim measures

sooner to fix sites more quickly.

## IV.    Because the County's Breach Necessitates Modifying the Consent Decree a Second Time, the Court Should Order the Parties to Negotiate a Suitably Tailored Modification

The United States recognizes that the County's chronic failures mean that a

further modification is necessary. But the proper course is for the Court to deny the

County's Rule 60(b) motion and order the Parties to take up to six months to

22

negotiate terms suitably tailored to the current circumstances. Those modifications should include (1) a more appropriate timeline, (2) new interim deadlines with associated stipulated penalties to ensure the County achieves compliance, and (3) a lump-sum penalty for its anticipated failure to comply with the 2027 deadline.

The United States also requests that, during negotiations, the Court leave the current deadlines in place to encourage the County to prioritize engaging with Plaintiffs to reach a new agreement. The United States recognizes this will expose the County to more stipulated penalties for missing deadlines, subject to Plaintiffs' enforcement discretion should the County seek to negotiate in good faith and expedite its plans. Though the United States agrees that County funds generally should go towards its sewer remediation, stipulated penalties serve an important deterrent purpose. *See* ECF 140 at 39:17–22 (transcript of January 30, 2025 hearing). Thus, in any second modification, the United States would also seek increased, tiered stipulated penalties for failure to comply with the new interim deadlines to incentivize compliance.

Separate from increased, tiered stipulated penalties, in any second modification, the United States seeks a $4 million penalty, payable immediately, for the County's past egregious disregard of its obligations under the Modified Consent Decree, plus an additional tiered penalty for each year that the County fails to meet the earliest reasonable date the United States believes compliance

23

would be possible, which is currently 2033. *See* Castillo Decl. ¶¶ 6, 64.f. A

significant penalty—nearly four times the roughly $1 million penalty associated

with the Modified Consent Decree—is appropriate and necessary. Given where the

Parties stand now, the penalty in the Modified Consent Decree has proven

insufficient to motivate the County to complete its work on time. A $4 million

penalty is consistent with the penalty factors that the Clean Water Act directs courts

to consider: the seriousness of the violations, the economic benefit resulting from

the violation, the history of the violations, good-faith efforts to comply, and the

economic impact of the penalty on the violator. 33 U.S.C. § 1319(d). The County is

culpable in this matter—it has repeatedly failed to timely do the work needed to

comply with court-ordered deadlines to the detriment of public health. The County

also failed to communicate directly with Plaintiffs about implementation obstacles

or potential plans in time to avoid this situation. Castillo Decl. ¶¶ 37–43. The

penalty needs to be substantial to deter further needless delays by the County. A

substantial penalty will also deter other defendants from disregarding deadlines in

consent decrees.

      The County can afford a $4 million penalty. Based on its current financial

statements, the County is able to absorb this amount with cash on-hand from its

General Fund, without acquiring debt and without touching the money in its

Watershed Fund, which is dedicated to drinking and wastewater infrastructure. *See* Coad Decl. ¶ 8.

The Parties have already begun discussing aspects of the County's proposed compliance plan. *See* Background, Section III, *supra*. If the Court directs the Parties to negotiate a second modification to the Decree, the United States is committed to continuing to work with the County to negotiate its terms. But this second modification must focus on the fastest feasible timelines to complete the remaining projects. The County has denied relief from sewer overflows to its citizens for too long, and more delay should not be tolerated.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court deny the County's Rule 60(b) Motion for a Second Modification to the Consent Decree. Because the Parties are already discussing the County's proposed compliance plan, the United States and the County agree that the Court should hold a hearing on this Motion in late October 2025.

Respectfully submitted this 30th day of July, 2025.

Of Counsel:

Paul Schwartz
Associate Regional Counsel
(GA 631055)
Telephone:  (404) 562-9576
Email: schwartz.paul@epa.gov
Tyler J. Levy-Sniff
Associate Regional Counsel
(GA 403125)
Telephone:  (404) 562-9499
Email:  sniff.tyler@epa.gov
Water Law Office
Office of Regional Counsel
U.S. Environmental Protection
    Agency, Region 4
61 Forsyth Street, Atlanta, GA
    30303

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Environment and Natural Resources
    Division
United States Department of Justice


*/s/ Thomas Landers*
THOMAS LANDERS
Trial Attorney (MD 1812110216)
Telephone:  (202) 532-3011
Facsimile:  (202) 514-0097
Email:  Thomas.Landers@usdoj.gov
RACHAEL KAMONS (MD 0512140122)
Telephone:  (202) 598-9739
Facsimile:  (202) 514-0097
Email:  Rachael.Kamons@usdoj.gov
Environmental Enforcement Section
Environment and Natural Resources
    Division
United States Department of Justice
PO Box 7611
Washington, DC 20044

26

## LOCAL RULE 7.1(D) CERTIFICATION

I hereby certify that the foregoing United States' Opposition to Defendant Dekalb County's Rule 60(b) Motion for a Second Modification to the Consent Decree was prepared using Times New Roman font (14 point), in compliance with Local Rule 5.1(C).

This 30th day of July, 2025.

*/s/ Thomas Landers*
Thomas Landers

## CERTIFICATE OF SERVICE

I hereby certify that the United States' Opposition to Defendant Dekalb County's Rule 60(b) Motion for a Second Modification to the Consent Decree was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

This 30th day of July 2025.

*/s/ Thomas Landers*
Thomas Landers