IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| and the STATE OF GEORGIA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:10-cv-04039-SDG |
| | ) | |
| DEKALB COUNTY, GEORGIA | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JAIRO CASTILLO, P.E.**

I, Jairo Castillo, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am over 18 years of age, and competent to testify regarding the matters discussed herein. I base this declaration on my personal knowledge, my training and experience in wastewater engineering, my experience as Chief of the Wastewater Enforcement Section in EPA Region 4's Enforcement and Compliance Assurance Division, and my more than six years of work on the civil judicial enforcement matter against DeKalb County, Georgia ("the County").

2.      I received a bachelor's degree in environmental engineering from the Polytechnic University of Puerto Rico in May 2005, and a master of science in civil engineering, environmental engineering specialization, from Mississippi State

University in May 2017. Since May 2014, I have been a registered professional engineer in the State of Georgia (License No. PE038734).

3.      At EPA I have been a wastewater engineer since September 2011 and section chief of the Wastewater Enforcement Section since July 2019. One of the primary functions of the Wastewater Enforcement Section is to oversee municipal compliance with the Clean Water Act ("CWA"). Previously, I served as a senior wastewater inspector and trainer for EPA Region 4.

4.      As Wastewater Enforcement Section chief, I am responsible for supervising and training nine wastewater enforcement officers/inspectors, assigning CWA inspections and enforcement actions, performing reviews of technical reports, and managing EPA's oversight of many judicial consent decrees and administrative orders on consent. I lead case teams in the development and prosecution of enforcement actions overseeing the delegated Wastewater Enforcement Programs of the eight southeastern states in EPA Region 4 as well as these state programs' use of EPA grant funds. I have provided leadership and expertise on numerous complex CWA enforcement actions focused on addressing sanitary sewer overflows ("sewer overflow" or "sewage overflow") and combined sewer overflows by municipal sewer systems. Currently, I regularly assess and monitor compliance in at least seventeen CWA civil judicial cases.

5.     On this case, I am assisted by Dennis Sayre, a civil engineer with more than fifteen years of experience in wastewater engineering, sewer construction, and in negotiating and managing judicial consent decrees involving municipal sewer systems and sewer construction, and who has been working on this matter on and off since 2009 (and was part of the initial investigation); and by Tristan Odekirk, an environmental engineer with five years of CWA enforcement experience who has worked on this case for two years.

6.     For reasons discussed below, based on my and my team's extensive knowledge, training, and experience in the areas discussed above and my work on this case, it is my professional opinion that: (a) the County's efforts in the past fourteen years to implement its Consent Decree obligations have not substantially eliminated sewer overflow occurrences or volumes; (b) the County's repeated revisions to its rehabilitation plans and schedules resulted in an expected failure to comply with the Modified Consent Decree deadlines; (c) the County has repeatedly failed to keep EPA and the Georgia Environmental Protection Division ("EPD") (collectively the "Agencies") apprised of changes to its plans and timelines; (d) the County failed to demonstrate that its original in-basin storage plan was infeasible; (e) the County failed to justify sequential construction of Shoal Creek trunk line replacements rather than interim measures and/or concurrent construction; (f) the

County can reduce the timeline for the Shoal Creek trunk line[1] replacement

projects by about four years (2033 instead of 2037) by using interim measures

combined with concurrent construction in certain segments, which would eliminate

tens of millions of gallons of raw sewage overflows in the years 2034 to 2037; and

(g) the County should not be excused from its minimum linear feet of pipe

assessment and rehabilitation obligations.

## I.    DeKalb County's Wastewater Collection and Transmission System

7.     DeKalb County has an area of about 268 square miles and is in North

Central Georgia, partially within and adjacent to the City of Atlanta. The County's

Department of Watershed Management ("Department") operates and maintains a

Wastewater Collection and Transmission System ("System") which services a

population of 764,382 (as of the 2020 census).[2] The System includes

approximately 2,600 miles of publicly owned sewers, an estimated 61,500

---

[1] A trunk line is a large sewer pipe that acts as the main artery of a sewer system by collecting wastewater from smaller sewer lines and conveying it to a treatment plant. Trunk sewer size is primarily determined by the anticipated design flow for the service area to provide adequate capacity.

[2] Unites States Census Bureau, *QuickFacts – DeKalb County, Georgia*, https://www.census.gov/quickfacts/dekalbcountygeorgia.

manholes, and 66 lift stations.[3] As shown in Table 1,[4] the System is similar—in terms of sewer miles and the size of the population served—to the sewer systems operated and maintained by other Metro Atlanta counties.

| Table 1: Metro Atlanta Sanitary Sewer Systems | | | |
|---|---|---|---|
| County | Miles of Sewer (approximate) | Population (2020) | Population Growth (2010–2020) |
| DeKalb | 2,600 | 764,382 | 10% |
| Fulton | 2,200 | 1,066,710 | 16% |
| Gwinnett | 3,000 | 957,062 | 19% |
| Cobb | 2,600 | 766,149 | 11% |

8.     DeKalb County's System is divided into three distinct sewer basins:

a.     **The "Inter-Governmental Basin"** collects and transports flow to the City of Atlanta, for treatment in Atlanta's R.M. Clayton Water Reclamation Facility (the largest wastewater treatment plant in Georgia). By miles of sewers, this basin comprises approximately 44% of the System.

b.     **The "Snapfinger Basin"** comprises approximately 42% of the County's System and is divided into fifteen sewersheds. Wastewater collected in

---

[3] DeKalb County Dept. of Watershed Management, *Priority Areas Sewer Assessment and Rehabilitation Program*, at 2 (July 2015), *available at* https://www.dekalbcountyga.gov/sites/default/files/PASARP.pdf.

[4] *See also* Gwinnett County, GA, *Wastewater*, https://www.gwinnettcounty.com/departments/water/whatwedo/wastewater; Cobb County, *Wastewater Collection System*, https://www.cobbcounty.org/water/water-sewer/wastewater-collection/system; https://www.fultoncountyga.gov/-/media/Departments/Public-Works/Connections-Newsletters/Spring-2020-Connections-Final.pdf

this basin is ultimately transported to the County's Snapfinger Advanced Wastewater Treatment Plant ("Treatment Plant"). The Snapfinger Basin includes the sewer trunk line segments that are at issue in the present briefing: Shoal Creek Trunk Line Sections 1, 2, and 3A/B; Upper Snapfinger Trunk Line Sections 1 & 2; Cobb Fowler north and south; and North Fork Peachtree Creek Trunk Line ("Snapfinger Basin Trunk Lines").

> c. **The smaller "Pole Bridge Basin"** contains the remainder (about 14%) of the System. Wastewater collected in this basin is transported to the County's Pole Bridge Advanced Wastewater Treatment Plant.

9. The System consists of separate sanitary sewers (sanitary sewage is collected in one set of pipes while stormwater is collected in another). By design, only sanitary sewage is conveyed to the Treatment Plant. If properly designed, constructed, operated, and maintained, separate sanitary sewer systems should generally have few sewer overflows outside of the most extreme weather events. Chronic or frequent overflows are often caused by three problems: (a) lack of system capacity; (b) inadequate collection system operation and maintenance; and/or (c) a deteriorating sewer system. ECF 118-3 ¶ 12.

10. To eliminate chronic sewer overflows, it is necessary to evaluate the causes of those located near each other, particularly from the standpoint of the hydraulic relationships between those points, and to identify remedial measures

that target those causes. For example, an undersized segment of sewer pipe may be causing sewer overflows at many locations upstream of the repair point during wet weather. Replacement of that pipe segment will, by itself or in concert with inflow/infiltration[5] reduction measures upstream, reduce and eliminate those recurring sewer overflows.

## II.    DeKalb County's Failure to Substantially Eliminate Sewer Overflows

11.    I am familiar with the Consent Decree entered on December 20, 2011 ("Decree"), and I participated in the technical discussions that led to the Decree's modification on September 22, 2021 ("Modification"). Preventing sewer overflows is the primary objective of the various remedial measures and programs required by the Decree and Modification.

12.    The Decree required the County to implement a Priority Areas Assessment and Rehabilitation Program ("Priority Areas Program") to identify, assess, and rehabilitate all priority areas by June 20, 2020. ECF 39 ¶ 35. This program targets structural and wet-weather capacity issues throughout key sub-sewersheds identified by the County, based upon factors such as condition, history of sewer overflows, system hydraulics, and sewer age and material. For these Priority Areas, the Decree required a thorough investigation of their condition and

---

[5] Inflow/infiltration refers to the unwanted entry of stormwater and groundwater into the sanitary sewer system through leaky manhole covers (inflow), or pipe cracks, leaks, faulty connections, etc. (infiltration).

capacities, and the identification and rapid implementation of measures to address structural issues and capacity bottlenecks. These measures can include sewer point repairs, upsizing and/or replacement, and/or rehabilitation using methods such as cured-in-place-pipe lining.

13.    The County did not meet the Decree's deadline to complete the Priority Areas Program by June 20, 2020. Many of the County's sewer overflows have been directly attributable to its failure to comply with this and other critical Decree requirements. The Modification extended the Priority Areas Program deadline by 7.5 years to December 20, 2027—sixteen years after entry of the original Consent Decree. The Modified Consent Decree strengthened the Decree in several areas, including by adding a requirement to fix 103 "Priority Fix List" locations (sites with recurring sewer overflows) on an expedited schedule. *See* ECF 83 ¶¶ 3, 7–8.[6]

14.    The Modification's Priority Fix List requirements include specific deadlines to fix sites with recurring sewer overflows, whether inside or outside of priority areas. When the Modification was entered, the County told the Agencies

---

[6] The modifications also included: (1) increasing the reporting requirements, ECF 83 ¶¶ 9–11; (2) requiring the County to add sites to the Priority Fix List when they experience recurring sewer overflows, *id.* ¶ 8; (3) increasing stipulated penalties, *id.* ¶ 13; (4) imposing annual linear feet of pipe rehabilitation requirements, *id.* ¶ 7; and (5) requiring use of a dynamic hydraulic model in implementing a "Capacity Assurance Program" to ensure that new flows are not added to the System unless adequate capacity can be certified or other conditions are met, *id.* ¶ 4.

that approximately 1.1 million linear feet of the System (about 8% of the total sewer length) within the Priority Areas Program would require rehabilitation to achieve adequate capacity and/or eliminate sewer overflows. ECF 83 at 7.[7] The 103 locations on the Priority Fix List at the time of the Modification included 48 locations within the priority areas and 55 locations outside of them. Areas outside the priority areas were addressed under the Consent Decree's Ongoing Sewer Assessment and Rehabilitation Program ("Ongoing Program"). Unlike the Priority Areas Program, the Ongoing Program applies to the entire System and requires ongoing assessment and rehabilitation of the whole System. ECF 39 ¶ 38.

15.    When the Modification was entered in 2021, the County represented that, given its improved understanding of the condition and performance of the System, the County had the information it needed to complete the Priority Areas Program and adequately fix all Priority Fix List locations by the December 20, 2027 deadline. ECF 76 at 16 (County's Motion to Enter Modification); ECF 76-2 at 47 (County's response to comments).

16.    Since the Modification was entered, the County has failed to make substantial progress in eliminating sewer overflows. As shown on Table 2 and Figure 1 below, based on the County's reporting from 2017 to March 2025, the

---

[7] Citations to page numbers of docketed filings refer to the page identification numbers assigned by the Electronic Case Filing ("ECF") system.

County discharged more than 165 million gallons ("MG") of raw sewage into local streams and rivers. The majority of these discharges—roughly 57%—are attributable to the Priority Fix List sites for which the County is seeking a schedule extension.

| Table 2: DeKalb County Raw Sewage Discharges to Local Waters | | |
|---|---|---|
| **Year** | **Number of discharges to surface waters** | **Volume of discharges to surface waters (MG)** |
| 2017 | 186 | 14.09 |
| 2018 | 183 | 5.69 |
| 2019 | 225 | 5.31 |
| 2020 | 306 | 34.98 |
| 2021 | 228 | 21.88 |
| 2022 | 242 | 12.2 |
| 2023 | 268 | 5.55 |
| 2024 | 366 | 54.6 |
| 2025 (through March) | 73 | 11.18 |
| **Total** | **2,077** | **165.5** |

*Figure 1: Discharges to local stream and rivers ("spills") from Priority Fix List sites at issue in 60(b) briefing, compared to all Priority Fix List sites*



17.    The Atlanta Metro area experienced extreme weather events in 2020 and 2024 that worsened sewer overflows in the area.[8] *See* 2020 Annual Report at 21 (March 1, 2021)[9]; ECF 144-1 at 42 (2024 Annual Report). However, it is not uncommon for sewer overflows to vary over the years in response to rainfall patterns and amounts.

18.    Another factor that can contribute to sewer overflows is increased "baseline flow"[10] on the portion of sewer capacity available to collect and convey peak wet weather flows. Baseline flow may increase due to increased groundwater infiltration from sewer deterioration, or by increased sewage flow due to economic/population growth in the system. From 2010 to 2020, the County saw population growth of almost 10%. Most of this growth occurred in capacity-limited portions of the System. Therefore, this additional flow may have contributed to meaningful increases in sewer overflows in those portions of the System.[11] The CWA requires municipalities to properly operate and maintain their systems which

---

[8] For 2024, the County identifies 28.2 million gallons as attributable to Hurricane Helene. 2024 Annual Report at 32. The Agencies have not verified this number.

[9] https://www.dekalbcountyga.gov/sites/default/files/users/user3551/DeKalb%20County%202020%20Annual%20Report%20No%209.pdf.

[10] Baseline flow is the average flow in the System from municipal, commercial, and industrial users connected to the system.

[11] Based on a conservative assumed wastewater flow of 80 gallons per day per capita, this growth led to an average flow of at least five million gallons per day.

include adequate sewer conveyance and capacity to address the growth demands. 40 C.F.R. 122.41(e). As shown in Table 1 above, other Metro Atlanta counties with similar population and sewage mileage do not have the same capacity limitations as DeKalb County and have grown similarly or more than the County has.

19.    In summary, the County's efforts to implement its Decree obligations during the past fourteen years have not resulted in substantially eliminating raw sewage overflow occurrences or volumes.

## III.    DeKalb County's Expected Failure to Meet the Modified Consent Decree Deadline of December 2027

20.    The Modification requires the County to adequately fix Priority Fix List sites so that no future sewer overflows are predicted to occur at such locations during a representative two-year, 24-hour storm event.[12] ECF 83 ¶ 8(j). The Modification gave the County until September 22, 2023 to address half of the initial 103 Priority Fix List locations, and an additional two years (until September 22, 2025) to address the remainder of the initial 103 Priority Fix List locations.

---

[12] A two-year, 24-hour storm is a rainfall lasting 24 that has a fifty percent probability of occurring in any one year. In the County, a two-year, 24-hour storm produces 3.69 inches of rainfall in a 24-hour period. National Oceanic and Atmospheric Administration, *Atlas 14 Point Precipitation Frequency Estimates: GA,* https://hdsc.nws.noaa.gov/pfds/pfds_map_cont.html.

21.    The Modification also allowed the County to seek extensions to address up to 21 of the initial 103 Priority Fix List locations. Any extension request must include: (a) a detailed description of the proposed project to address the location; (b) a proposed timeline (including interim project milestones); and (c) a technical justification for the proposed timeline, which must not extend beyond the Modification's December 20, 2027, deadline for final compliance.

22.    On February 1, 2021, the County submitted a request to extend the deadlines for adequately fixing twenty Priority Fix List locations.[13] The County requested extensions for four locations until December 31, 2025, for four other locations until July 31, 2027, and for twelve locations until December 20, 2027.

23.    As detailed below, the County's failure to promptly select and implement a specific project—combined with limited technical information shared during the Agencies' review process—made it difficult for the Agencies to approve the requested extensions and the Agencies did not approve them. Initial alternatives proposed by the County included constructing an in-basin storage facility[14] to manage the excessive wet-weather flows that contribute to sewer

---

[13] *See* ECF 125-1 at 111–16 (request for nine (out of the twenty) sites associated with the Shoal Creek Trunk Sewer); *id.* at 117 (June 2023 memorandum referring to the requests for all twenty sites).

[14] In-basin storage refers to a tank that has the capacity to hold or store wet weather flows within the sewer basin boundaries.

overflows at the Priority Fix List sites and addressing the Snapfinger Basin Trunk Lines ("Snapfinger Basin Trunk Projects"). The County told the Agencies that it could complete this work before the December 20, 2027 deadline.

24.    On June 16, 2023, Dekalb submitted to the Agencies a Technical Memorandum, entitled "Update on Fifteen (15) Priority Fix List Locations Associated with the Snapfinger Basin." ECF 125-1 at 117–37. In this memorandum (as well as the July 31, 2023 Semi-Annual Report, ECF 105-1), the County informed the Agencies that it desired more time to develop and evaluate alternative options[15] to adequately fix fifteen Priority Fix List sites subject to its February 1, 2021 extension request. The County also stated that it was moving away from the in-basin storage plan due to concerns about siting the storage facilities in locations where it anticipated opposition from affected communities. But the County also wrote (and assured Agency staff during the parties' meetings) that it remained "mindful" of the Modification's December 2027 deadline and expressed no concerns about not meeting the deadline during the technical quarterly meetings.

25.    It is standard practice in this type of case for municipalities to participate in regular meetings and to coordinate closely with EPA. During the

---

[15] At this time, the alternative options all involved storage including construction of a 15–20 MG storage tank at the plant or installation of a 7.4-mile storage tunnel.

2023 quarterly technical meetings (September 28, 2023 and December 12, 2023), the County's technical representatives told the Agencies that some of the alternatives it was considering might not meet the December 2027 deadline. During these meetings, the County discussed various "headwinds" that could affect the schedule including more expensive fixes to existing trunk sewers. The County said it was working on alternatives to its original in-basin storage plan (namely storage at the treatment plant or in a new storage tunnel), but that it would not complete its analysis of the alternatives until 2024 and that County staff would then need to present the options to County leadership for their consideration. Likewise, the County's semi-annual report in July 2023 (ECF 105-1 at 17–18) indicated that the County was focusing on alternatives to address the delayed Priority Fix List sites other than in-basin storage due to community concerns. But this report did not say the County might miss the 2027 deadline.

26.     The Agencies, however, became concerned that the County would not meet the December 2027 deadline and was not in a position to select a viable plan to meet such deadline. These concerns grew throughout 2023 and 2024. In an August 20, 2024 technical memorandum, the County described objections of County leadership to the original in-basin storage plan. ECF 125-1 at 37, 56. This memorandum also discussed the County possibly pivoting from in-basin storage to full replacement of the Shoal Creek trunk lines, and that the County had no viable

options to meet the December 2027 deadline. At that time, the County was unable to identify a concrete remedial plan, but the County gave no indication to the Agencies that it would need to seek an extension of almost a decade.

27. The August 2024 memorandum also described the County's efforts to identify interim and temporary measures to more quickly address Priority Fix List locations while also pursuing its preferred long-term solutions. The memorandum noted that the Agencies had asked the County to identify temporary, interim measures to more quickly achieve Consent Decree compliance. ECF 125-1 at 42–45. But the County concluded that such options were not feasible. *Id.*

28. At the January 30, 2025 status conference, the County presented a new conceptual plan for fixing 14 Priority Fix List sites associated with the Snapfinger Basin.[16] *See* ECF 137-1. This presentation for the first time outlined a plan to pursue full replacement of trunk lines on a timeline extending almost ten years beyond the current Modified Consent Decree deadline of December 20, 2027.

29. In March 2025, in response to the Court's order, the County sent to the Agencies a plan entitled "Updated Plan and Request for Additional Time to Adequately Fix 14 Priority Fix List Locations Associated with the Snapfinger

---

[16] The County informally presented this plan to the Agencies at a January 29, 2025 meeting—just one day before the January 30th status conference with the Court.

Basin" under Paragraph 8(j) of the Modified Consent Decree ("March Plan"). ECF 148 at 14–66. The March Plan described in more detail the conceptual plan that had been shared at the January 2025 status conference, and identified a set of selected projects. In this plan, the County no longer proposed in-basin storage but rather extensive new infrastructure—including full replacement of six trunk lines (more than 100,000 linear feet).

30.    On April 15, 2025, the Agencies disapproved the County's requested extension because: (a) Paragraph 8(j) of the Modification requires that any request for additional time to address Priority Fix List sites must include a schedule that cannot extend beyond December 20, 2027, and (b) the March Plan proposes a schedule that extends almost a decade beyond this deadline to June 30, 2037.

31.    At an April 14, 2025 meeting about the March Plan, the Agencies shared with the County several questions and concerns, including that the plan continued to lack interim, protective measures to reduce the frequency or volume of sewer overflows, and requested an additional 10 years to address Priority Fix List sites.[17]

---

[17] The Agencies review the County's proposed plans and provide comments; they do not dictate plans to the County.

**IV.    The County Failed to Commit to a Plan on a Timely Basis, Causing It to be Unable to Meet the Modified Consent Decree Deadlines**

32.    When the Modified Consent Decree was entered, the County had proposed in-basin storage to address the Priority Fix List sites. The County's February 1, 2021 request discussed multiple in-basin storage tanks. In 2022, the County had updated its plan to consider several new in-basin storage configurations. Throughout 2023 and 2024, the County continued to consider different wet weather storage options. The estimated completion deadlines ranged from 2027 (in-basin storage) to 2031 (construction of a storage tunnel) to 2033 (construction of additional storage at the plant and construction of transmission lines to deliver the excess flows to the plant for storage).

33.    At the January 2025 status conference which I attended, the County presented a revised conceptual plan that departed from previous estimated completion deadlines for the various alternatives. The County asserted that the "in-basin storage" option would now have a projected completion of December 2036 (the County also changed this option to eliminate the East Snapfinger Storage Basin and increase the trunk line components of this option). The projected completion of the storage tunnel was shifted to 2040. And the projected completion of increased storage at the Snapfinger Plant was changed to mid-2037. This option was also changed to eliminate the new storage tank component of the plan and

18

instead focus on trunk line expansion and replacement and expansion of the plant lift station and the plant treatment capacity.

34.    The March Plan does not resemble any of these previous alternatives. Instead of relying on new in-basin storage in the collection system, the March Plan instead involves full replacement of the Shoal Creek trunk lines within the Snapfinger Basin (with new upsized lines to increase capacity). The March Plan also involves major proposed modifications to and expansion of the Treatment Plant even though the plant is not part of this enforcement case.[18]

35.    Based on these newly proposed major modifications to and expansion of the Snapfinger Plant, the County's influent pump station and treatment works may have been undersized and incapable of adequately conveying and treating the sewage flows that would have reached the Snapfinger Plant had the County eliminated its sewer overflows by the decree deadlines. Basically, the County may have relied on sewer overflows to avoid overwhelming the plant.

---

[18] The March Plan states that sewage overflows at four Priority Fix List locations "result from capacity limitations associated with the Snapfinger Plant's influent lift station and its wastewater treatment systems." ECF 148 at 32. To address these plant capacity limitations, the March Plan calls for replacing the existing 70 million gallons per day ("MGD") influent lift station with a new 160 MGD lift station. *Id.* at 33. The March Plan also calls for completion of two membrane bioreactor clusters (for a total of six clusters) at the Snapfinger Plant to increase capacity (expanding the capacity of these bioreactors to 100 MGD) and manage wet weather peak hour flows. *Id.* 32–33, 36.

36.     Under the March Plan, the Treatment Plant expansion will not be completed until June 2029. So, the County's late decision to abandon in-basin storage plans has made it impossible for the County to meet the December 2027 deadline, because the County says plant expansion is a prerequisite to full trunk line replacement.

## V.     The County Has a History of Withholding Information From the Agencies Regarding its Implementation of Consent Decree Projects

37.     For multiple years the County withheld from the Agencies significant information regarding changes to its plans and timelines.

38.     A 2020 "optimization study" cited in the Dr. Tien and Kleckley Declarations states that the study's "recommended solution" was trunk line upsizing (replacement with new larger pipes), but the County departed from this in favor of less costly parallel sewers (adding new pipes next to old pipes). Jacobs, *Optimization Study Technical Memorandum*, at 21 (Aug. 7, 2020) (Exh. 1) (under heading "Manual Review and Refinements"). The County did not provide this technical memorandum to the Agencies until 2024.

39.     Likewise, the County's 2023 Basis of Design Report ("2023 Report") (Exh. 2) recommended total replacement of the trunk lines at issue. Yet even though the parties have four meetings per year, the County did not share this report or discuss schedule impacts that would result from full trunk line replacement and plant expansion until its 2025 presentation to the Court and the Agencies.

40.    As discussed above, the County knew for years that it was moving to full trunk replacement but did not formally present those plans until March 2025. In my extensive CWA enforcement experience, this pattern is an outlier among municipalities in EPA Region 4 (the Southeast) and unique to DeKalb County. Defendants in our other sixteen CWA civil judicial sewer overflow cases usually share important information that might significantly affect their compliance schedule in a timely manner to support productive discussions and negotiations with the agencies.

41.    The County frames its decision to abandon its in-basin storage plan as necessary to address community concerns with locating the storage facilities within communities. But the County did not implement its detailed community engagement plan or any other community engagement strategy, and has not provided to the Agencies any indication that the community preferred an additional decade of exposure to raw sewage discharges in order to keep storage facilities out of the community. The County also has not shown that it presented to the community the alternative it had developed to locate the storage tanks underground with park-like amenities on the surface.[19]

---

[19] *See* ECF 125-1 at 36–37 (August 2024 memorandum depicting the park amenity design that was intended to address community concerns).

42.    The County also argues that the ten-year construction schedule is due to additional technical data collected during the 100% design phase. However, my review of the relevant documents shows otherwise.[20] In 2017, the County reported completion of its priority areas sewer assessment. All but four of the fourteen Priority Fix List sites in the Snapfinger Basin that have been the subject of the County's extension requests are in Priority Areas that were assessed by 2017. The 2023 Basis of Design Report (Exh. 2) documented hydraulic limitations, invert irregularities, and slope constraints in the Shoal Creek Trunk Lines based on available closed-circuit television footage obtained from 2016–2022—with the majority obtained from 2017 closed-circuit television data. And the 2023 Report stated that the trunk line project could be completed by 2027 or 2028 (in thirty months) under a plan to construct certain trunk line segments concurrently. 2023 Report at 6-2 & Appendix H.

43.    And, a February 25, 2025 Parallel Relief Sewer Option Memorandum (Exh. 3, at 5) states that "[e]ach CD trunk sewer corridor was physically walked by the EOR [engineer of record] and DWM [Department of Watershed Management] personnel several times (once at 30% for alignment refinement to address conflicts, proximity to creek banks, structures, topography, stream crossing geometry (trying

---

[20] My review included but was not limited to the 2023 Basis of Design Report, Atkins Clarification Memo, 100% design drawings, and County capital budgets.

to keep crossings perpendicular to the creek), major roadway/GDOT crossings and sequencing constraints," demonstrating that the issues with constructability in the existing trunk line path were known prior to the 100% design process.

## VI.     The County Has Failed to Demonstrate That Its Original In-basin Storage Plan Was Infeasible

44.     The March Plan does not consider the County's original multi-tank in-basin storage plan to address the Priority Fix List sites. Instead, it considers a different single-tank in-basin storage plan that involves substantially more trunk line work, a longer implementation timeline, and that has a higher cost estimate. But, the County has not shown the original in-basin storage plan would not more quickly address those sites.

45.     The Kleckley Declaration discusses temporary offline storage options that the County could have used to address spills from the Priority Fix List locations, ECF 159-2 ¶¶ 36-40, but the County failed to pursue them when it abandoned its original plans.

46.     Indeed, building additional in-basin or ground storage to eliminate Priority Fix List locations (and thus high-volume sewer overflows) more quickly would not have precluded the County from also pursuing replacement of the Snapfinger Trunk Lines or expansion and Treatment Plant expansion described in the March Plan as a long-term capital investment to accommodate future growth and enhance long-term compliance.

## VII.   The County's March Plan Does Not Justify Sequential Construction of New Trunk Lines

47.     Based on my expertise and experience in wastewater engineering and study of relevant documents,[21] portions of the Shoal Creek Trunk Line replacement sections 1 (about 3.7 miles) and 2 (about 2.8 miles) can and should proceed on a concurrent basis, rather than in the rigid, sequential, decade-spanning sequence proposed in the County's March Plan.

48.     The County's 2023 Report confirms that Shoal Creek Trunk Line Sections 1 and 2 are designed along new alignments, allowing the existing trunk sewer to remain in service during construction. 2023 Report at 5-1 – 5-2 & Table 5-1. This eliminates the need for continuous bypass pumping and supports concurrent work. *Id.* at 4-6, 4-13. The County's own engineering firms (which include some of the largest engineering firms in the world) acknowledged that "all [three sections] can be constructed simultaneously, if needed" and "the project construction time is estimated at 30 months." *Id.* at 6-2.

49.     The County walked back this 30-month estimate in a 2025 "Clarification Memo" from its engineers at Atkins (Exh. 4). In this memo, the

---

[21] This includes my review of the County's May 2023 Basis of Design Report (Exh. 2), the County's February 2025 Atkins "Clarification Memo" ("Atkins Clarification Memo) (Exh. 4), the March Plan, the March 2025 Easement Tracker (Exh. 5), County capital budget projections through 2037, and statements made during technical meetings between the parties.

County asserted that following the completion of the 100% design documents, "the simultaneous construction of the [Shoal Creek] sections is no longer technically feasible." The County identified tie-in locations requiring bypass pumping—seven in Section 1 and three in Section 2. Atkins Clarification Memo at 1–2. But at the June 3, 2025 technical meeting, County engineers stated that bypass logistics would not preclude concurrent work and would be managed by contractors per bid specifications. ECF 159-2 at 25 (meeting notes, ¶ 1.a.viii). Also at this meeting, County staff admitted that concurrent construction is "technically possible" and confirmed that early-completion bonuses are included in the construction bid package to incentivize such acceleration. *Id.* (notes ¶ 1.a.iv); ECF 159-2 at 40 (DeKalb County MCD Update to EPA/EPD (June 12, 2025)).

50.     At the June 12, 2025 technical meeting the County again tried to clarify its position and asserted that there were more than three street crossings in Section 2 that would need extensive bypass pumping. During this meeting and as stated in Mr. Kleckley's Declaration, the County stated that there are many locations identified in the 100% design drawings (included as an attachment to the March Plan) "where the new trunk sewer would cross both the existing trunk sewer and collector sewers, making long-term bypass pumping an infeasible solution to enable concurrent construction." ECF 159-2 ¶ 47. And the 100% design drawings stamped by the County's engineers in 2024 assume a roughly 30-month

construction schedule (the start/stop dates on the drawings were placeholders but not the length of construction).[22] Based on all of this, the 2025 Clarification Memo raises more questions than answers, and the County has provided inconsistent information about crossings that may require bypass pumping.

51.    There is no compelling reason preventing the County from concurrently constructing all trenched portions of Shoal Creek Trunk Line Sections 1 and 2 that do not require live crossings (installing a new pipe above or below an existing, actively flowing pipe) or bypass pumping. Indeed, at the June 3, 2025 technical meeting, County engineers acknowledged that staggered construction and contractor discretion were intentionally "built into" the specifications. As also discussed during that meeting, standard construction practice allows for new pipe segments to be "dead ended" temporarily (completed up to a tie-in point and capped)—until downstream segments are ready for final connection. This enables work on long stretches of pipe to proceed without delay, even where tie-ins or bypass points must wait. The County has not adequately analyzed or ruled out this phased/concurrent construction technique option as part of its March Plan.

52.    At the June 12, 2025 technical meeting, EPA suggested that the County should be able to conduct open-trench construction concurrently for Shoal

---

[22] Shoal Creek Section 1 100% Drawings (2024) (Exh. 6); Shoal Creek Section 2 100% Drawings (July 2024) (Exh. 7).

Creek Trunk Line Sections 1 and 2, by "dead-ending" the trench where it crosses or disrupts currently functioning lines until the downstream segments are finished and ready to accept flow. In other words, EPA suggested that the County can construct long sections of the gravity sewer pipe up to the points where the existing sewer line will cross over the new sewer path and then connect the existing sewers during the final phase of construction. This alleviates the need for extensive bypass pumping that the County claims would be required.

53.    The County provided a follow-up document dated June 26, 2025 titled "Supplementary Insights: A Focus on Prior Explanations in the 8(j) Plan [March Plan]" ("Supplement") (Exh. 8). In the Supplement, the County provided additional thoughts on why it believes concurrent construction is not workable. However, the County's thoughts lacked sufficient detail to justify its reasoning and do not show that concurrent construction is unworkable.[23]

---

[23] Many other major sewer relief projects have successfully employed construction techniques such as phased easement access, staged bypass systems, and night/weekend work to enable concurrent segment/project construction. Just a few examples include Portland's East Side Big Pipe (a six mile, 22-foot diameter CSO tunnel) (2006-2011) (used dead ending), Portland's West Side CSO Tunnel (2002-2006) (used dead ending), Boston South Boston CSO Storage Tunnel (2007-2011) (used dead ending), District of Columbia Water CWA Settlement (MCD 2015), SeattleShip Canal Water Quality Project, and the City of Atlanta's Tanyard Creek Trunk Sewer Rehabilitation (used trenchless methods).

## VIII.  The County Does Not Need Until 2037 to Address the Final Priority Fix List Sites and Priority Areas

54.    The County's plan to conduct the work only considering sequential (consecutive) order is overly conservative, resulting in an unnecessary extension of the project timeline by several years.

55.    According to County documents, easement acquisition for Shoal Creek Trunk Line Sections 1 and 2 is nearing completion. AECOM, Easement Tracker (March 2025) (Exh. 5); ECF 159-2 at 39.

56.    The Upper Snapfinger Creek trunk line work (which is not associated with any Priority Fix Locations) could also be completed sooner than 2034 and 2036 by using concurrent construction and/or other measures. But the County has not provided the Agencies with much information about this work.

57.    As a reason for extending the project timeline out almost ten years from the current deadline, the County asserts in its Motion the need to address three Priority Fix List locations associated with Shoal Creek Trunk Line Section 3—Site 59 (217 Green Street), Site 160 (South Columbia Drive), and Site 247 (1431 Conway Drive).[24] *See* ECF 159-1 at 3. Under the County's Project

---

[24] In the March Plan, two sites require work beyond 2034: Site 160 (S. Columbia Drive, and Site 4 (1433 Deerwood Dr.). ECF 148 at 19. In the County's June 16, Motion, there are three sites requiring work in the 2024–37 period, with the Deering Dr. site deleted and the Green Street and Conway Dr. sites added. ECF 159-1 at 3. This shift in sites requiring work during the 2034–37 period is an

Schedule, these locations are the only basis for not fixing all Priority Fix List sites by June 30, 2034. *See id.* at 3.

58.   The County's own historical sewer overflow records show that these three sites overflow infrequently and in such low volumes that upsizing the downstream trunk lines need not occur before being able to take effective measures at these sites. *See, e.g.,* ECF 152-1 at 41 n.6 (County Quarterly Report dated April 30, 2025). In fact, at the June 3, 2025 technical meeting, County staff stated that Site 59 had no overflow during recent heavy rainfall events, and both Site 59 and Site 247 could be stabilized with interim solutions by December 2027. ECF 159-2 at 26 (technical meeting notes, ¶ 2.a–b). These statements confirm that near-term management of these sites is feasible without delaying larger construction segments.

59.   One of the County's declarations states that all three sites are capable of being fixed by early interim actions such as offline storage. ECF 159-2 at 12–14 (Kleckley Decl.). This was reinforced during the April 2025 status conference before the Court. At that conference, the County's counsel represented to the Court that one of the three sites (Site 59) had previously been removed from the Priority Fix List due to strong performance, including no overflows during periods of

---

example of the shifting proposals and information submitted by the County that have made it difficult for the Agencies to respond.

extreme rainfall. ECF 157 at 35. Though recently re-added following two low-volume overflows, the County acknowledged that an interim fix is available and is expected to be implemented by December 2027.

60.    Interim and temporary measures to address these Priority Fix List sites would allow trunk replacement work to proceed without delay. This would better advance the remedial goals of the Consent Decree rather than waiting to fix these locations until 2035–2037. Such interim and temporary measures would reduce the total project timeline for eliminating overflows from Priority Fix List sites by three years. (The permanent measures can become part of the County's Ongoing Assessment and Rehabilitation Program.)

61.    At our technical meeting with County representatives on June 3, 2025, the County presented conceptual plans for interim measures that would eliminate some of the largest overflows (sites 40, 42, and 43) by the current December 2027 deadline (instead of 2029 as proposed in the March Plan), and other measures that would reduce or eliminate overflows at earlier dates than described in the March Plan. The County's latest proposals show that the County is capable of exploring viable options for earlier compliance.

62.    In addition, the County is required, under Paragraph 38 of the 2011 Consent Decree, to implement the Ongoing Program which requires the County to ensure continuous assessment and rehabilitation of the County's system. Given the

30

need to address the Priority Fix List locations at issue in the County's extension request and to include certain non-Priority Areas in its rehabilitation plans to meet the Priority Fix List deadline, the County should have targeted these areas for assessment under the Ongoing Program in order to adequately inform the Priority Fix List rehabilitation plan submitted with its 2021 extension request.

## IX.    The Purpose of the Minimum Linear Feet of Pipe Assessment and Rehabilitation Obligations

63.    The main objective of the complex rehabilitation minimum linear feet requirements is to enforce and expedite the rehabilitation of the System's chronic inflow/infiltration problem, and the County itself estimated the linear footage rehabilitation needs during the Modification negotiations. *See* ECF 125-1 at 119–21 (June 2023 memorandum).[25]  These interim deadlines ensure that the County expeditiously reduces excess inflow/infiltration in the System. *See* ECF 83 ¶ 7.

## X.    Summary

64.    In conclusion, based on the foregoing and my and my team's extensive knowledge, training, and experience in, wastewater engineering, sewer

---

[25] The June 2023 memo states: "In the absence of managing [inflow/infiltration] through in-basin storage, the County anticipates that it will need to significantly expand and expedite its plans to remove [inflow/infiltration] from both the public and private portions of the system and will need to improve the conveyance capacity of additional portions of the Snapfinger trunk sewers." ECF 125-1 at 119.

construction, CWA municipal enforcement, and the history of this case, it is my professional opinion that:

  a. The County's efforts in the past fourteen years to implement its Decree obligations have not substantially eliminated sanitary sewer overflow occurrences or volumes.

  b. The County's repeated revisions to its rehabilitation plans and schedules resulted in an expected failure to comply with the Modified Consent Decree deadlines.

  c. The County has repeatedly failed to keep the Agencies apprised of changes to its plans and timelines.

  d. The County has failed to demonstrate that its original in-basin storage plan was infeasible. The County could have used this plan as an interim measure to eliminate Priority Fix List locations while pursuing the trunk line replacement and Treatment Plant upgrade plans.

  e. The County's March Plan does not justify sequential construction of Sections 1 and 2 of the Shoal Creek trunk lines replacement, instead of interim measures and concurrent construction in certain segments with no extensive bypass pumping needs.

  f. By using concurrent construction and interim/temporary measures to stabilize certain Priority Fix List sites, the County could reduce the

total project timeline and/or adequately fix all remaining sites by about four years (2033 instead of 2037) thereby eliminating tens of millions of gallons of raw sewage overflows from 2033 through 2037. (The other trunk sewer work mentioned in the Kleckley Declaration was not included in the March Plan for the Agencies to review and discuss during the technical meetings.)

g.    The County should not be excused from its minimum linear feet of pipe assessment and rehabilitation obligations.

Executed on this day of July 30, 2025

JAIRO CASTILLO

Digitally signed by JAIRO CASTILLO
Date: 2025.07.30 08:20:24 -04'00'

JAIRO CASTILLO, P.E.
Manager, Wastewater Enforcement Section
Water Enforcement Branch
Enforcement and Compliance Assurance Division
U.S. Environmental Protection Agency, Region 4
Atlanta, Georgia

## <u>List of Exhibits to Castillo Declaration</u>

- Exh. 1: Jacobs, Optimization Study Technical Memorandum (Aug. 7, 2020)

- Exh. 2: Atkins, Basis of Design Report (May 12, 2023)

- Exh. 3: Atkins et al., Parallel Relief Sewer Option Memorandum (Feb. 25, 2025)[26]

- Exh. 4: Atkins, Construction Sequencing and Basis of Design Report Clarifications (Feb. 12, 2025)

- Exh. 5: Easement Tracker by AECOM (March 2025)

- Exh. 6: DeKalb County, Shoal Creek Section 1 100% Drawings (2024)

- Exh. 7: DeKalb County, Shoal Creek Section 2 100% Drawings (2024)

- Exh. 8: DeKalb County, Supplementary Insights: A Focus on Prior Explanations in the 8(j) Plan (June 26, 2025)

---

[26] The Feb. 25, 2025, memorandum does not identify an author, but page one of the document states that it contains summaries of "the primary findings from the [County's] various Engineer of Records."